C. DOUGLAS WILSON & CO., a South
Carolina Corporation, Plaintiff,

v.

INSURANCE COMPANY OF NORTH
AMERICA, PHILADELPHIA, PENN-
SYLVANIA, Hartford Accident and In-
demnity Company, Hartford, Connecti-
cut, and St. Paul Fire and Marine Insur-
ance Company, St. Paul, Minnesota, De-
fendants.

Civ. A. No. 75–1226.

United States District Court,
D. South Carolina,
Greenville Division.

Order July 8, 1977.

On Motion to Set Aside Judgment
N. O. V. August 3, 1977.

Wesley M. Walker, Leatherwood, Walker, Todd & Mann, Greenville, S. C., for plaintiff.

W. Francis Marion, Haynsworth, Perry, Bryand, Marion & Johnstone, Greenville, S. C., for St. Paul Fire & Marine Ins. Co.

Frank H. Gibbes, III, Rainey, McKay, Britton, Gibbes & Clarkson, Greenville, S. C., for Hartford Acc.

Wm. M. Hagood, III, Love, Thornton, Arnold & Thomason, Greenville, S. C., for Ins. Co. of N. A.

## ORDER

CHAPMAN, District Judge.

This action was brought to establish the defendants' liability on fidelity bonds issued by them to the plaintiff. After incurring a loss because of dishonest conduct by one of its employees, plaintiff submitted a proof of loss to each defendant. All of the defendants denied coverage and plaintiff then filed this action seeking a declaratory judgment as to which bonds, if any, provided coverage for the loss. The case was tried before the Court and a jury and resulted in a verdict for the plaintiff. The matter is now before this Court on motion of the defendants Insurance Company of North America and Hartford Accident & Indemnity for a judgment n. o. v. or alternatively for a new trial.

The plaintiff, C. Douglas Wilson & Co. (CDW), is a mortgage broker with its main office located in Greenville, South Carolina. It was founded in 1928 by Mr. C. Douglas Wilson and has since grown to become one of the largest, if not the largest, mortgage broker in South Carolina. Since C. Douglas Wilson had a number of employees both in its main office in Greenville and in branch offices in other South Carolina cities, it was exposed to potential losses in the event one or more of its employees engaged in dishonest or criminal conduct which caused financial loss. CDW attempted to protect itself from such a contingency by purchasing a "Mortgage Banker's Blanket Bond" from defendant St. Paul Fire and Marine Insurance Co. on March 25, 1971. Under the terms of this bond St. Paul agreed "to indemnify the Insured (CDW) against any loss through any dishonest, fraudulent or criminal act of any of its employees, committed anywhere and whether committed alone or in collusion with others." This bond was a "discovery" bond in that it covered losses "sustained by the insured at any time but discovered after noon of the 25th day of March, 1971, and prior to the termination or cancellation of this bond . . . ." Thus a loss resulting from a dishonest or criminal act on the part of a CDW employee would be covered under the St. Paul bond regardless of the time at which the dishonest act was committed so long as CDW "discovered" a loss resulting from that act within the bond period. This bond had a $500 deductible and limits of $1,000,000.

In 1970 CDW entered into merger discussions with NCNB Corp. and these discussions eventually resulted in a merger agreement which was reached in August of 1971. A year later the merger (actually an acquisition of stock) was accomplished and CDW became a wholly-owned subsidiary of NCNB Corp. An introduction of the men who played roles in the events leading up to this lawsuit is appropriate at this point. After the merger, Robert Cashion, who headed NCNB Corp.'s mortgage banking subsidiaries, became chairman of the board of CDW. The remainder of the board was composed of Calvin Ridgeway, who was also president of CDW; C. Douglas Wilson and his nephew Sidney Wilson; and three other men who were connected with NCNB Corp. The Chairman of the Board of NCNB Corp., Mr. Addison Reese, also participated in the events which resulted in this suit. An organizational chart of CDW showing the officers who served under Calvin Ridgeway is as follows:

| . . . . . . . . . . Calvin Ridgeway, President . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | |
|---|---|---|---|
| Bob Waldrop, V.P. Income Loans (Bob Taylor replaced early in 1973) | Tom Hawpe, V.P. Residential & Const. Loans | Jim Williams, V.P. Greenville Branch Manager | Jack Newton, V.P. Spartanburg Branch Manager |
| J. L. Barksdale FHA multi-family | Andy Treadway Commercial Loans | | Bill McEachern Asst. Secretary |

Prior to the merger Robert Cashion discussed insurance coverage for CDW with Calvin Ridgeway and C. Douglas Wilson and a decision was reached for CDW to continue its existing coverage with St. Paul until the bond expired on March 25, 1973, and then to convert to coverage under NCNB Corp.'s blanket bonds which had been issued by INA and Hartford. In January and February of 1973 Cashion was aware that the coverage changes were coming up on March 25.

NCNB Corp. and its subsidiaries were insured against losses from employee dishonesty by bonds issued by INA and Hartford. On March 25, 1973, CDW also became

an insured under these bonds. The INA bond is entitled "Banker's Blanket Bond." This bond is very similar to the St. Paul bond because it covers "[l]oss through any dishonest or fraudulent act of any of the Employees, committed anywhere and whether committed alone or in collusion with others." Also, like St. Paul's, INA's bond is a discovery bond which covers losses "sustained by the insured at any time but discovered during the bond period." The limits of the INA bond are $8,000,000 and the bond has a $50,000 deductible. Because of the large deductible provision in the INA bond, the Hartford bond was purchased to fill the gap for NCNB Corp.'s mortgage banking subsidiaries. It had limits of $50,000 and a $1,000 deductible. By its terms, the Hartford bond covered any "loss sustained by the insured (CDW) through fraudulent or dishonest acts committed during the bond period by any Employee . . . ." Unlike the St. Paul and INA bonds, the Hartford bond is a "loss sustained bond" rather than a "discovery" bond. The loss sustained must result from an act of dishonesty committed during the bond period. The discovery of the loss does not have to occur during the bond period but must occur within at least one year from the end of the bond period. Despite the fact that the Hartford bond was written on a loss sustained basis, at the trial it was treated as a discovery bond because of its "substitute" provision. The issue concerning the effect of this provision will not be reached due to the disposition reached below.

Sometime during the spring of 1973 CDW discovered that it was likely to sustain a substantial loss because of allegedly dishonest conduct by J. L. Barksdale, the employee in the income loan division who was responsible for all FHA–HUD multi-family loans. By way of background, in the late 1960's the Federal Housing Administration, a division of HUD, began to emphasize the construction of apartment complexes for low income families by offering to insure the mortgage loans on the property. The construction of one of these projects would be initiated by a "sponsor" who was a person or corporation interested in investing in a low income housing project. This sponsor would approach FHA to determine whether FHA saw a need for a multi-family housing project in a certain area. FHA would study the sponsor's proposal and if it determined that the proposed project was desirable it would so inform the sponsor by writing a feasibility letter informing him that the proposed project at the proposed location was approved by FHA. The sponsor would then apply to FHA for a conditional commitment and would furnish to FHA the preliminary architect's drawings and preliminary engineering reports so that FHA would have a better concept of exactly what type of project was proposed. If FHA was satisfied with the nature of the project as proposed, it would issue a conditional commitment which would mean that, if everything was accomplished in the proper fashion, FHA would issue a definite commitment to insure the repayment of the mortgage loan.

The sponsor would then approach a mortgage banker, such as CDW, to obtain a commitment for the loan. Then the final architectural and engineering drawings would be prepared and submitted to the FHA which would issue a firm commitment. At this point, a meeting would be held for the "initial closing" of the loan. Present at this meeting would be the sponsor, his attorney, the mortgagee (CDW), the architect, FHA officials, and perhaps others.

After the initial closing, construction on the project would begin and the sponsor would make periodic, usually monthly, requests to the mortgagee for advances, or construction draws. These advances were required by the sponsor so that he could make monthly payments for labor and materials. After completion of construction, an application would be made to FHA for an "endorsement" of the loan which was essentially FHA's final commitment to insure the permanent loan.

As a condition for insuring the mortgage loans on these low-income projects, FHA required that the sponsor make certain de-

posits to insure that he was financially able to complete the project and to cover certain contingencies. These deposits were required to be either in cash or represented by an irrevocable letter of credit. One of these deposits was referred to as the "working capital deposit," and its purpose was to assure the availability of funds to pay certain fees to FHA or HUD, real estate taxes on the project, insurance premiums for fires and other perils, and routine expenses associated with opening the project for occupancy.

Another deposit was required to assure the availability of funds to meet anticipated operating deficits during the rent-up period after completion. A deposit was also required to assure completion of the project in view of the fact that the loan insured did not represent 100% of the cost of the project. Because the project was known to cost more than the amount loaned by the mortgagee, FHA wanted to make sure that the sponsor was financially able to produce the additional funds needed to complete the project.

One additional deposit was required to assure that the sponsor could pay certain fees and discounts to the permanent lender. These costs resulted from the fact that a construction mortgagee, such as CDW, did not remain mortgagee after completion. CDW was not in the business of investing in long term obligations, therefore, after final endorsement by FHA, it would sell the loan package to an insurance company or savings and loan association. It would then receive the monthly payments on the loan or "service" the mortgage loan for a certain fee. Since FHA regulations prevented the permanent lender from charging as high an interest rate as it customarily received, the permanent lender would make up the difference by requiring the sponsor to pay certain fees and discounts up-front. The last deposit was required by FHA to assure the sponsor's ability to pay these fees and thus obtain the permanent loan.

Prior to the time that CDW became involved with FHA multi-family loans it had been extensively involved with FHA single-family loans. Accordingly, there were a number of CDW employees who were familiar with FHA loans in the single-family area. When CDW decided to become involved with FHA multi-family loans, it needed to assign someone the responsibility for operating this segment of CDW's business. Since there were no CDW executives, who were familiar with FHA multi-family loans, James L. Barksdale was requested to familiarize himself with the regulations, forms and procedures in connection with these loans and he was placed in charge of this division. Barksdale had started to work for CDW in 1962 and had been assigned to help Robert Waldrop with conventional income producing loans. When Barksdale was placed in charge of FHA multi-family loans, he was still a subordinate of Waldrop; however, Barksdale was the only person in the CDW organization who had any appreciable knowledge about FHA multi-family loans. If someone else in the organization had some question about procedures followed in a multi-family loan, he would ask Barksdale.

As previously discussed, in an FHA multi-family project a number of steps were involved between the sponsor's proposal and FHA's final endorsement. Many of these steps involved the completion and execution of FHA forms. One of these forms was entitled "Commitment for Insurance of Advances." This form was prepared by the FHA and was issued to both the mortgagee and the sponsor before initial closing of the loan. By the terms of the commitment, FHA stated its intent to insure the mortgage "subject to compliance with the requirements of the Regulations, and the terms and conditions set forth" in the commitment form. One of the terms in that form provides:

> Approval of advances in accordance with the Building Loan Agreement must be obtained on a form prescribed by the Commissioner prior to the date of each advance to be insured.

The relevance of this term will be demonstrated later. At the initial closing, CDW would execute a form entitled "Mortgagee's

Certificate." On this form CDW would certify that it had obtained the various deposits referred to previously. These forms almost always indicated that the deposit received by CDW was in the form of a letter of credit. By completing and signing this form, CDW would also certify that it would not "make any loans or advances to the mortgagor, any of the sponsors, the general contractor, or the architect for any purpose connected directly or indirectly with this project without prior written approval of the Commissioner."

During the course of construction on the project, another FHA form was involved in connection with each advance. The back side of this form (FHA 2403) was entitled "Request for Payment." This form was filled out by the mortgagor and submitted to CDW and requested a construction advance of a specified sum. The costs to be paid with the requested advance were itemized and the architect signed the form at the bottom certifying that he had visited the project and that the work for which payment was requested had been completed in accordance with the contract drawings. After receiving this document from the mortgagor, CDW would complete and sign the top half of the form on the front side. This section of the form was entitled "Application for Insurance of Advance of Mortgage Proceeds." On this form CDW requested FHA approval of the advance and stated its intention to disburse the requested funds on a specified date provided it received prior approval from FHA. The form would then be sent to FHA which would complete the bottom half of the front side entitled "Certificate of Mortgage Insurance". By executing this form, the FHA notified CDW that a specified amount was approved for advance and that the funds advanced would be insured by the FHA.

The final form in this procedure was entitled "Request for Final Endorsement of Credit Instrument." By executing this form, CDW was seeking FHA's final assurance that the loan to the mortgagor was completely covered by FHA insurance so that the permanent loan package could be sold. To complete this form CDW would prepare a schedule of advances listing the date of each advance and the amount thereof. By signing the form, CDW "declare[d] . . . that advances have been made . . . on the dates and in the amounts set forth in the schedule . . . ." The reverse side of this form also contained two sections entitled Certificate of Mortgagor and Certificate of General Contractor. The mortgagor would certify that it had received the amount of the loan insured by the FHA and the contractor would certify as to the completion of construction and payment of all obligations under the construction contract. The very bottom of this form contained the following warning:

U. S. Criminal Code, Section 1010, Title 18, U.S.C., "Federal Housing Administration Transactions", provides in part: "Whoever, for the purpose of . . . influencing in any way the action of such [Administration] . . . makes, passes, utters, or publishes any statement, knowing the same to be false, . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both."

All of these forms which were submitted to the FHA by CDW were required to be signed by some CDW official. Although J. L. Barksdale was completely in charge of the FHA multi-family division of CDW, he frequently directed other CDW officials to sign these forms on his assurance that they were in order and in accordance with FHA regulations. Accordingly, although a number of these forms were signed by Barksdale, some of the forms contained the signatures of Andrew Treadway, Assistant Vice-President in charge of commercial loans, and William McEachern, Assistant Secretary to the Manager of the Spartanburg branch.

The branch offices of CDW handled loans on single family residences, both conventional and FHA insured. All of the income loans were handled through the home office in Greenville. However, there was one exception in that the Spartanburg branch handled some FHA multi-family loans.

The reason for this was that one of CDW's best customers in the Spartanburg branch, real estate developer Gene Phillips, became interested in investing in low income multi-family projects insured by the FHA. Phillips dealt primarily with William McEachern, the assistant manager of the Spartanburg branch, and McEachern, not being familiar with FHA multi-family loans, relayed Phillips' inquiries to Barksdale in Greenville. As it turned out, Phillips invested heavily in FHA multi-family projects and the FHA insured construction loans on his projects were handled through the Spartanburg office. Although McEachern signed many of the FHA forms on the Phillips projects, it appears that his duties were merely clerical. He signed the FHA documents at Barksdale's direction on the assurance that everything was in order. Barksdale had the sole responsibility for obtaining the letters of credit or cash deposits required by FHA for all multi-family loans whether they were handled through the Greenville or Spartanburg offices.

With this background, the series of events leading up to this lawsuit can now be discussed. In February of 1973, CDW's senior vice president in charge of the income loan division, Robert Waldrop, retired and was replaced by Robert Taylor. After beginning his work at CDW, Taylor learned that the FHA multi-family loans fell into his division and that J. L. Barksdale was in charge of those loans and was CDW's expert on the FHA procedures and regulations which applied to these multi-family loans. In early March, Taylor learned that the FHA multi-family loans constituted a substantial proportion of CDW's business. Accordingly, in order to familiarize himself with this aspect of the business, and because as the vice president in charge of income loans he was responsible for those FHA loans, Taylor asked Barksdale to explain the procedures followed in these loans. Barksdale and Taylor got together and went over a number of the files on the FHA loans. Taylor was shown the various documents required by the FHA, one of which was the Mortgagee Certificate. After Barksdale had explained the deposits which were required by the Mortgagee Certificate, Taylor asked where the letters of credit representing these deposits were kept. Barksdale replied that he kept them in the office safe.

Also in early March, specifically on March 2, a Mr. Robert Shaw accompanied Cashion on a visit to CDW's Greenville office to meet the key men in the organization. Shaw was a vice president of CDW's parent, NCNB Corp., and had the title of "credit review officer". He was an internal auditor with the responsibility of reviewing the loan portfolios of NCNB Corp.'s subsidiaries. Shaw was a subordinate of Addison Reese, who at that time was chairman of the board of NCNB Corp. After conducting a credit review of one of the subsidiaries, Shaw would report his findings to Reese and to the head of the subsidiary whose loan situation he was reviewing. Shaw's visit to CDW on March 2 was the preliminary step of a credit review of CDW which had been requested by Reese. Shaw was in Greenville for only half a day on the 2nd and, in addition to meeting the CDW officers, only had time to review a few of the loans on single family residences. He returned to Greenville on Friday, March 16, to continue familiarizing himself with CDW procedures in preparation for a full scale review. This time he concentrated on income loans and reviewed some representative files on which a report had been prepared by CDW personnel. Shaw was familiar with FHA multi-family loans through his knowledge of the credit extended by NCNB Mortgage Corp., another wholly owned subsidiary of NCNB Corp. However, when he reviewed the FHA files at CDW, he noticed that the files were much different and he experienced some difficulty in analyzing the credit which had been extended. One of the problems he encountered was reconciling the advances shown on the Request for Final Endorsement with the advances indicated by the bookkeeper's ledger records. Shaw felt that some other document might explain the apparent inconsistency so he selected a file on a project known as Keoway Apartments and made a

photocopy of the schedule of advances shown on the Request for Final Endorsement and of the advances shown by the ledger. He took these copies to Barksdale and asked whether the information shown was correct or whether he was reading the documents incorrectly. Barksdale told him that the figures shown on the ledger were correct but that the information shown on the Request for Final Endorsement was not. He explained that the discrepancy resulted from the fact that CDW frequently made construction advances prior to receiving approval for the advance from FHA, and the figures on the Request for Final Endorsement were wrong because they reflected that all advances had been made in accordance with FHA approval. These figures were apparently manipulated so that all FHA forms would be in proper order. When Shaw inquired as to the reason for making these "pre-advances" Barksdale explained that CDW did this to accommodate the sponsor, who was experiencing difficulty because of the delay between his request for payment and the actual advance. It appears that it sometimes took three to four weeks for a request for payment to be approved by FHA during which time the sponsor's laborers and suppliers were pressuring him for payment for the services or goods which had been supplied. Shaw asked Barksdale whether this practice of advancing prior to receipt of approval was sanctioned by FHA and Barksdale replied that FHA was aware of the practice and knew that the information contained on the schedule of advances was not correct. In light of this explanation, Shaw continued his review of the five representative files selected by CDW. After finishing his review, Shaw went to meet with Ridgeway but found that he had left the office for the day. However, Ridgeway's secretary said that he would be in Charlotte on Monday to meet with Cashion and Shaw could see him then. Shaw then drove back to his home in Charlotte and over the weekend prepared a memorandum to Ridgeway revealing his discoveries concerning the pre-advance situation. This memo was typed at the office on Monday morning, the 19th, and copies were prepared for Messrs. Reese and Cashion. This memo of March 19 reads as follows:

*Keoway Apartments*

This past Friday I visited with Tom Hawpe and Jim Wall to review several of your commercial loan credit files to become familiar with your procedures and records in connection with my initial credit review of C. Douglas Wilson & Co. in the near future. In reviewing this FHA insured advances project, several items were noted which I would like to bring to your attention.

On several occasions, construction loan advances have been made before FHA approval has been received, with some advances being greater than the amount subsequently approved by the FHA. We have been advancing what the developer may request while the FHA might approve a smaller sum. On March 1, 1973, C. Douglas Wilson & Co. submitted a "Request For Final Endorsement of Credit Instrument" to the FHA in which the date and amount of each advance and total advances of $818,292.16 were certified. A number of the dates and amounts were not correctly given and the total actually advanced is $898,292.16, with the extra representing three advances in August, September, and November, 1972, without FHA approval. Total outstanding is 99.5% of the note face amount of $902,900.

First Federal Savings and Loan of Greenville provided the permanent loan take out and also bought 100% of the construction loan. As noted above, they have bought $80,000 above the amount approved by the FHA. This apartment project was expected to be completed by March 1, 1972, and purchased then by First Federal; however, weather delayed construction, the completed project is having occupancy problems, and the project purchaser has inadequate funds to carry the project. First Federal has extended its take out on several occasions and I understand it now expires March 31, 1973, however, I was unable to find a

copy of this current extension. Interest has not been paid on the loan since May, 1972. I was unable to find builders risk insurance coverage with appropriate loss payable.

Wooten Construction Company, the developer and contractor, and Mr. Ward Stone have been long and valued customers of C. Douglas Wilson & Co.

During the course of my visit Friday, I reviewed several other commercial credit files and commitments and it appears that similar situations exist with other credits. It looks like we have advanced more than our note and mortgage on Cherry Mobile Home Park.

Ridgeway and Cashion were in conference in the office in Charlotte and Shaw had the memo delivered to them during a break. After they had had a chance to read the memo, Shaw, Ridgeway and Cashion met to discuss Shaw's findings as revealed therein. A detailed discussion was held with both Ridgeway and Cashion expressing some concern about the pre-advance situation despite Shaw's description of Barksdale's justification for the practice. Most of this concern centered on the exposure that CDW had on advances made beyond the amounts approved by FHA because such excess amounts would be uninsured. The decision was then made that Ridgeway would return to Greenville and have CDW personnel review all FHA loans to determine the extent of CDW's exposure as a result of these pre-advances (sometimes called "over advances"). Shaw visited the Greenville office again on April 16 or 17 and discovered that no work had been done on determining the amount of the over-advances on the FHA loans. He then reviewed all FHA files himself and determined that over-advances, that is advances made by CDW without HUD approval and without insurance, totaled more than $575,000. Shaw then met with Ridgeway on the 18th and revealed his findings.

Later in April, an unrelated series of events of particular importance unfolded. William McEachern was in Gaffney making his regular call on Phillips and Phillips expressed an urgent desire to meet with McEachern and Jack Newton. Newton was tied up with other matters and tried to postpone such a meeting, but, because of Phillips' urging, met with him and McEachern at eighty-thirty or nine o'clock that night. At that meeting Phillips revealed that he was experiencing rather severe financial difficulties and wanted a working capital loan from CDW in the neighborhood of $1,000,000. In light of this request a meeting with Robert Taylor and Tom Hawpe was scheduled in the Greenville office the next day. Present at this meeting were Taylor, Hawpe, Newton, McEachern and Phillips. After a discussion of Phillips' request, which centered mainly on CDW's reasons why such a loan could not be made, Phillips said CDW might as well make the loan, because if he went under, the letters of credit would have to be called on and many of these letters of credit were issued by the North Carolina National Bank, another subsidiary of NCNB Corp. This statement came as a shock to the CDW personnel and they decided to determine how many letters of credit had been issued by NCNB. McEachern offered to find out how many letters of credit had been issued by NCNB and he went into Barksdale's office and asked him who had issued the letters of credit on Phillips' FHA project. Barksdale then said something to the effect that he could take the pressure from the over advances but not from the letters of credit and admitted to McEachern that he had not obtained any of the letters of credit. McEachern then went back to the meeting and repeated what Barksdale had told him. In light of this information, Taylor also went to see Barksdale to inquire about the letters of credit and Barksdale also told him that he didn't have them, neither on the Phillips loans nor on the rest of the projects. The next day, the CDW officers at the meeting went to Charlotte and discussed the situation with Cashion and a decision was made to loan Phillips $1,200,000. At this meeting, Cashion and Taylor also decided to fire Barksdale. Taylor called Barksdale from Charlotte and asked him to stay at the office until he got there.

Taylor and Ridgeway then met with Barksdale at six o'clock that day and presented him a letter of resignation which he signed. Barksdale then cleared out his personal belongings and left that night.

Immediately after the discovery of these missing letters of credit, NCNB Corp. sent an internal auditing team to Greenville to determine CDW's exposure as a result of the missing letters of credit. This exposure resulted from the fact that, since CDW had certified to FHA that it had obtained the letters of credit, CDW, in the event of a default situation which necessitated calling on the letters of credit, had to stand behind them. The internal audit to determine the potential loss to CDW resulting from the missing letters of credit was conducted primarily by Robert Shaw. By May 10, he had determined that CDW could possibly lose as much as $3,000,000 because of Barksdale's failure to obtain the letters of credit he had certified existed on the Mortgagee Certificate. The three insurance companies were then notified of a potential claim arising out of this financial loss caused by Barksdale. After determining that the loss potential approached $3,000,000, CDW personnel took steps to mitigate any losses arising from the absence of the letters of credit by seeing that some of the projects were completed despite the sponsor's insolvency, or by foreclosure or by any other means which would possibly eliminate the necessity for calling on the letters of credit. These mitigation efforts were successful to some degree and CDW now claims losses as a result of the missing letters of credit of approximately $1,250,000. After all the insurance companies denied coverage for this loss, CDW instituted this lawsuit. Since the exact amount of the loss was not precisely known at the time the suit was filed and since CDW is continuing its efforts to mitigate its losses, the complaint did not ask for monetary damages but rather sought a declaratory judgment as to the liability of each company on its bond. In this suit, plaintiff was only claiming a covered loss as a result of the missing letters of credit. No claim was made because of the over advances because plaintiff claimed that it sustained no loss as a result of this practice.

At the trial, plaintiff presented evidence to prove its position that Barksdale's conduct of certifying on the Mortgagee Certificate that CDW had obtained the required letters of credit, when in fact these letters of credit had not been obtained, constituted dishonest conduct for which the defendants' bonds afforded coverage. Plaintiff proceeded primarily against INA and Hartford because it took the position that the loss was discovered after March 25, 1973, the effective date of each bond. St. Paul was named as a defendant so that if the discovery date was determined to be prior to March 25, CDW would be entitled to recover from St. Paul on its fidelity bond. Plaintiff asserted that the loss was discovered on May 10, the date that the full extent of the loss became known. In any event, plaintiff's attorneys claimed that the loss was not discovered prior to April 26, the date on which the letters of credit were discovered to be missing.

Defendants INA and Hartford defended primarily on the theory that CDW had knowledge prior to March 25 that Barksdale had committed a dishonest act in connection with the over advances. According to them, this knowledge, since it was not communicated to the companies, voided the bonds coverage as to Barksdale. Defendant St. Paul took the position that no one at CDW discovered dishonest conduct which resulted in a loss prior to March 25 so as to cause its bond to afford coverage.

Plaintiff supported its claim by showing that the bonds had been issued, that the premium had been paid and that it had sustained a loss. It reinforced its argument that the certification with respect to the letters of credit was a dishonest act by introducing a guilty plea of J. L. Barksdale to an indictment charging him with three counts of violating 18 U.S.C. § 1010. This section of the Code makes it illegal to submit false information to the Department of Housing and Urban Development with the intent of influencing the actions of that department.

Plaintiff also addressed itself during its case in chief to the defense of INA and Hartford that CDW discovered dishonest acts by Barksdale prior to March 25. Plaintiff attempted to distinguish between Barksdale's conduct with regard to the letters of credit and his conduct with regard to the over advances. Witnesses for the plaintiff testified that, even after receipt of Shaw's March 19 memo, no one at CDW, except possibly Barksdale, knew that advancing construction money prior to receipt of FHA approval was a violation of FHA policy and regulations. All of the participants in this series of events asserted that they considered the over-advances to be a poor business practice but they did not consider it to be dishonest conduct. Plaintiff pointed to the fact that the situation involving the letters of credit was different from that involving the over-advances. Barksdale was fired almost immediately after the letters of credit were discovered to be missing; however, no action, not even a reprimand was taken against Barksdale after the March 19 memo revealed the over-advance situation. Furthermore, Barksdale was only convicted of submitting false forms to FHA in connection with the letters of credit. He was not convicted of, nor was there even an investigation into an indictment arising from, false certifications made by Barksdale concerning the advances.

Plaintiff also pointed out that the practice of over advancing did not subject CDW to the same risk of loss as did the failure to obtain the letters of credit. The reason for this was that there was only a short time lapse during which the construction advance would be uninsured. This was so because, even though an advance was made prior to receipt of FHA approval and thus without insurance, the approval would be forthcoming and the money advanced would soon be insured.

· With regard to the Mortgagee Certificate, the form which Barksdale was convicted of falsifying, plaintiff argued that the criminal and dishonest act was the certification that the letters of credit had been obtained when they had not. Although Barksdale, by signing that form, also certified that CDW would make no advances prior to receipt of FHA approval, plaintiff argued that this certification was not a dishonest act since it only represented an intent to perform a future act.

Plaintiff's response to the defense of INA and Hartford was essentially that none of the actions of Barksdale in regard to the over advance situation can be considered dishonest. However, plaintiff argued, even if they were dishonest, CDW did not know prior to March 25, or have any reason to know before that date, that Barksdale had committed a dishonest act. To the contrary, all CDW officials, who knew about the practice of over advancing, considered it to be a poor business practice, but not dishonesty.

■ At the close of plaintiff's case, defendant St. Paul made a motion for an involuntary nonsuit on the ground that no evidence had been presented that any act of dishonesty which caused a loss to CDW had been discovered during its bond period. Although plaintiff's attorneys did not vigorously oppose this motion, the attorneys for INA and Hartford argued that St. Paul should not be released from the case because they intended to introduce evidence that the missing letters of credit were discovered prior to March 25, 1973, possibly as early as November, 1972. The Court, however, granted St. Paul's motion despite the protests from INA and Hartford because plaintiff had failed to prove any loss for which St. Paul's bond would provide coverage. The Court was of the opinion then, and is now, that the fact that the plaintiff sought a declaratory judgment rather than damages does not extinguish its burden of proving a claim. St. Paul could not be forced to remain in the suit merely because a codefendant intended to introduce evidence which might establish St. Paul's liability.

The case presented by INA and Hartford primarily centered on their claim that CDW knew of dishonest conduct on the part of Barksdale prior to March 25. The legal basis for such a defense was twofold. First,

the remaining defendants asserted that, if CDW had knowledge that Barksdale had committed a dishonest act, it had a duty imposed by the common law to disclose this fact to the defendants prior to their providing fidelity coverage for Barksdale. Second, each bond had a clause providing that it would be "cancelled as to any Employee . . . as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee . . ." (INA bond § 10). Accordingly, since CDW knew about Barksdale's dishonesty before the effective date of the INA and Hartford bonds, the bonds were cancelled as to him before the bonds even took effect and he was, therefore, never covered. The defendants had the burden of proving two things in order to prevail on this defense. First, they had to prove that some act of Barksdale, which was connected with the over advancing, constituted a dishonest act. Second, they had to prove that some officer or director of NCNB Corp. or CDW knew or had reason to know prior to March 25, that Barksdale had committed a dishonest act.

In arguing that Barksdale's action with regard to the over advances constituted dishonest conduct, defendants attempted to prove that no difference existed between the false certifications on the Mortgagee's Certificate regarding the letters of credit and the false certifications on the Request for Final Endorsement regarding the dates and amounts of construction advances. Defendants elicited admissions from NCNB Corp. and CDW officers and directors, who participated in the series of events outlined, that the policy at CDW was that all FHA regulations were to be followed and that all forms submitted to FHA were to be accurate and truthful. Many, if not all, of these witnesses also admitted that they considered the false certifications on the Request for Final Endorsement regarding the advances to be a dishonest act. Some even called such conduct criminal. However, every witness who admitted the dishonest nature of such conduct qualified this admission by asserting that, at the time when they learned about the over advances and the certifications with respect to them and

in light of the circumstances existing at that time, they did not consider any conduct of Barksdale to be dishonest but rather considered it to be poor business practice.

In the course of their attempt to prove dishonesty in connection with the over advances, defendants also argued that, even though Barksdale was never indicted or convicted because of any conduct regarding the over advances, the certification of false dates and the amounts of advances on the Request for Final Endorsement was a violation of 18 U.S.C. § 1010. This is the same criminal section that Barksdale violated by falsely certifying the existence of the letters of credit.

As to the knowledge aspect of their defense, defendants placed reliance on Shaw's March 19 memorandum. They asserted that Shaw discovered the dishonest acts of Barksdale on March 16 and that Reese, Cashion and Ridgeway had knowledge of Barksdale's dishonesty on March 19 after receiving that memo.

In the closing instructions to the jury the Court explained that four questions had to be answered in order to ascertain whether the defendants' bonds provided coverage. The first question was whether plaintiff had met its burden of proving that the false certifications regarding the letters of credit was a dishonest act. This question was necessary because defendants took the position that the acts of Barksdale in this connection were not "dishonest" within the meaning of that term as used in the bonds. The jury was next asked to determine whether CDW had discovered prior to March 25 that Barksdale had failed to obtain the letters of credit. This question was asked because Barksdale's deposition was read to the jury which indicated that CDW officials knew about the missing letters of credit as early as November 1972. Defendants used this evidence to counter that of the plaintiff which showed a discovery date between April 26 and May 10, 1973.

The last two questions involved the defense of prior discovery of a dishonest act. In the third question, the jury was asked to

determine whether Barksdale's actions with respect to the over advances were dishonest. If the jury determined that they were, they were asked to consider the fourth question which asked, "[S]hould a reasonable employer, under the same circumstances and with the same facts and at the same time, have realized that such certifications of pre-advances and over advances were dishonest and fraudulent." Trans. at 808.

After deliberating less than thirty minutes, the jury returned with a verdict for the plaintiff. After reviewing the evidence and the briefs in support of and in opposition to the motions, the Court is of the opinion that the verdict of the jury is against the clear weight of the evidence and should be set aside.

In reaching this conclusion, the Court has determined that the evidence is so overwhelming that it proves, as a matter of law, both that Barksdale's conduct in falsely certifying the Request for Final Endorsement was dishonest and that the management of CDW knew about this dishonesty prior to March 25.

 The Court is not holding that all of Barksdale's actions regarding the over advances were dishonest as a matter of law. For example, a legitimate factual issue was presented as to whether the certifications on the Mortgagee's Certificate relating to the advances was dishonest. Plaintiff made a valid argument that the certificate on that form that CDW would not advance prior to receipt of FHA approval was not dishonest because it related to intent to perform a future act. This same argument would apply to the "Application for Insurance of Advance of Mortgage Proceeds" in which CDW, through Barksdale, stated its intent to disburse a specified sum "provided we receive prior approval". Whether these certifications by Barksdale constituted dishonest conduct was a valid factual issue which the jury had a right to decide. The jury also had a right to determine whether Barksdale's violation of FHA regulations by advancing prior to receipt of approval constituted dishonesty on his part. A technical violation of a regulation does not, as a

matter of law, constitute dishonest conduct under a fidelity bond. *See Fidelity & Deposit Co. of Maryland v. Peoples Bank of Sanford*, 72 F.2d 932 (4th Cir. 1934). However, the false certifications made by Barksdale and others at his direction on the Request for Final Endorsement cannot be considered as anything but dishonest. The form for the Keoway project, which was the subject of the March 19 memo, stated:

> The undersigned declares that construction of this project is complete, and that advances have been made to the mortgagor in accordance with your Certificate of Insurance on the dates and in the amounts set forth in the schedule below; and that to the best of the undersigned's knowledge and belief the said loan is now eligible for mortgage insurance and accordingly, the undersigned hereby requests final endorsement of the attached credit instrument for mortgage insurance . . . . .

This form, which was signed for CDW by J. L. Barksdale, contained a schedule of advances in which both the dates and amounts of many of the advances were incorrectly stated and which contained a figure representing the total amount advanced which was incorrect. The evidence clearly showed that this information was incorrect because Barksdale had intentionally falsified the figures so that they would conform with those in FHA's file and FHA would, therefore, insure the permanent loan. Barksdale falsified this form despite the warning on the back thereof that knowingly making a false statement to the FHA for the purpose of influencing in any way the action of that administration constituted a criminal act. Thus, in addition to being dishonest, the false certification of this form was criminal. There is no question that Barksdale knew the information was false and that his purpose was to influence the FHA by getting it to endorse the loan.

The determination that Barksdale's false certification of the advance schedule was dishonest as a matter of law is consistent with the legal definition of "dishonesty" as that term is used in a fidelity bond. In *City*

*Loan & Sav. Co. v. Employer's Liability Assur. Corp., Ltd.*, 249 F.Supp. 633 (N.D. Ohio 1964), the Court stated:

> "Dishonesty", as used in a fidelity bond, is to be interpreted according to its usual and ordinary meaning. To constitute dishonesty, the conduct need not amount to a crime and need only involve bad faith or a want of integrity or untrustworthiness or a disposition to lie or cheat or a faithlessness to a trust. To constitute dishonesty, there need not be an intent to profit or to cause a monetary loss to the employer.

249 F.Supp. at 656 (citations omitted). *See also Arlington Trust Co., Inc. v. Hawkeye Security Ins. Co.*, 301 F.Supp. 854 (E.D.Va. 1964); 9 *J. Appleman, Insurance Law and Practice* § 5706 at 566–67 (1943). However, even if the legal definition of dishonesty did not dispositively characterize the certification of the over advances, plaintiff's position that the letter of credit certifications were dishonest would require that the certifications as to the advances also be dishonest. There can be no distinction between the false certification on the Mortgagee's Certificate and the false certification on the Request for Final Endorsement. If one is dishonest, then the other necessarily is also.

■ Even though Barksdale committed a dishonest act by falsely certifying the advance schedule, the defense of prior discovery does not succeed unless officers or directors of NCNB Corp. or CDW knew about these acts of dishonesty prior to March 25. There is no question that a number of individuals knew that Barksdale was advancing funds prior to receipt of FHA approval. These individuals included Waldrop, Shaw, Cashion, Reese and Ridgeway. However, this knowledge, without more, would not justify setting aside the jury's resolution of the knowledge issue. Whether or not the making of the over advances was dishonest was a question of fact for the jury. Likewise, whether the knowledge of the over advance practice constituted knowledge of dishonesty was also a question of fact.

If, on the other hand, CDW had knowledge of false certifications prior to March 25, then CDW had knowledge of dishonesty as a matter of law. This is so because "[w]here . . . one has actual knowledge of facts which without more, constitute dishonesty as a matter of law, it follows that one has actual knowledge of dishonesty as a matter of law." *City Loan & Sav. Co. v. Employers' Liability Assur. Corp., Ltd., supra* at 657. This conclusion is consistent with the test which states that one "discovers" dishonesty when he acquires "knowledge which would justify a careful and prudent man in charging another with fraud or dishonesty." *Hidden Spendor Mining Co. v. General Ins. Co. of America*, 370 F.2d 515, 517 (10th Cir. 1966) quoting from *American Employers' Ins. Co. v. Raton Wholesale Liquor Co.*, 123 F.2d 283, 285 (10th Cir. 1941).

The evidence overwhelmingly establishes that CDW had actual knowledge of false certifications prior to March 25. Shaw clearly knew about this conduct on March 16. He discovered the false certifications and even discussed with Barksdale the Request for Final Endorsement which had been falsified. There is no question that he knew Barksdale was certifying incorrect information to FHA to cover up the advances made without FHA approval. He then relayed this information in his March 19 memo and his discussion with Cashion and Ridgeway that same day. That memo discussed the false certification as follows:

> On March 1, 1973, C. Douglas Wilson & Co. submitted a "Request for Final Endorsement of Credit Instrument" to the FHA in which the date and amount of each advance and total advances of $818,-292.16 were certified. A number of the dates and amounts were not correctly given and the total actually advanced is $898,292.16, with the extra representing three advances in August, September, and November, 1972, without FHA approval.

The memo itself would not conclusively establish that Barksdale intentionally falsified the form. However, from the testimony at trial, it appears that the recipients of

that memo interpreted it in that manner. Addison Reese, Chairman of the Board of NCNB Corp., gave the following testimony in this regard:

Q. Based on your review of Mr. Shaw's March 19 memorandum and I am referring to the one that first brought to light the question of the over advances and your subsequent discussions with him and the conference which you had on the following day and so forth, you were aware, were you not, that the over advance situation did involve a false certification being made to FHA or HUD, is that correct?

A. Yes.

Q. And you understood also that that false certification was made by an officer or employee of C. Douglas Wilson & Company?

A. Yes.

Q. At that point in time did you know whether that certification was an oral certification, a written certification or whatever?

A. Written.

Q. Again, based on these same meetings, conferences and memoranda, you are aware that a false certification had in fact been made to FHA?

A. Yes.

Transcript at 702. Robert Cashion, Chairman of the Board of CDW, also admitted to knowledge of these false certifications:

Q. "Or how would you justify that?"

A. "I can't justify it, but I can explain it. The individual doing it was apparently covering up his mistakes in having advanced money beyond the amount of certification."

Q. All right, sir. So, on March 19 when you received the memorandum, you were aware that the only explanation, not justification, but explanation for that form going to the government like that was that a man was trying to cover up his mistakes?

A. Right.

Q. That man was J. L. Barksdale?

A. Right.

Q. And he was sending something to the government to cover up his prior mistakes.

A. Right.

Transcript at 344–45.

The evidence at trial also established knowledge on the part of CDW even before the March 19 memo. Robert Waldrop, Barksdale's superior and former vice president in charge of the income loan division testified as follows:

Q. Were you aware that Mr. Barksdale was making false certifications to FHA or HUD regarding these over advances?

A. I was aware that he was making applications and certifications which did not deal with what we were advancing. He told me this.

Transcript at 639–40.

Any decision by the jury that CDW did not have knowledge of dishonest conduct by Barksdale prior to March 25 is against the clear weight of the evidence. The testimony to the effect that CDW officials did not consider Barksdale's conduct to be dishonest at that time does not make discovery a factual issue. CDW had knowledge of the false certifications as a matter of law and the false certifications were dishonest as a matter of law. Accordingly, CDW is charged with knowledge of Barksdale's dishonest conduct.

The fact that Barksdale's dishonest conduct was discovered by CDW prior to March 25 requires that defendants be granted a judgment n.o.v. for two reasons. First, CDW had a duty to disclose to both INA and Hartford its knowledge that Barksdale had been falsely certifying the Request for Final Endorsement. The rule requiring such disclosure has been stated as follows:

Any taking advantage of a surety by withholding proper information has been held to avoid the bond. And the nondisclosure of material circumstances affecting the situation of the parties which are within the knowledge of the person procuring the bond has this effect, even though not wilful or intentional or with a

view to any advantage to the person obtaining the bond.

9 *J. Appleman, Insurance Law and Practice* § 5291 at 89 (1943).

Defendants are also entitled to a judgment in their favor by virtue of clauses in each bond which terminate coverage as to any employee immediately upon discovery by the employer of any dishonest or fraudulent conduct by that employee. A clause such as this was given effect in *City Loan & Sav. Co. v. Employers' Liability Assur. Corp., Ltd., supra.* The bonds in that case provided that they "shall be deemed cancelled as to any Employee . . . immediately upon discovery by the Insured or by any partners, or officers thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee." In that case, the employer discovered dishonest conduct by one of its employees in 1956 and, since the bond was issued in 1957, the acts of dishonesty discovered after the effective date of the bond were not covered. Other cases which have voided coverage under such clauses because the insured knew of prior acts of dishonesty by its bonded employee include *First Nat. Bank of Sikeston v. Transamerica Ins. Co.*, 514 F.2d 981 (8th Cir. 1975) and *Ritchie Grocer Co. v. Aetna Casualty & Sur. Co.*, 426 F.2d 499 (8th Cir. 1970). Accordingly, since CDW is charged with knowledge on or before March 16 of Barksdale's dishonesty, the INA and Hartford bonds were cancelled as to him before they became effective on March 25. The affirmative defense was proved as a matter of law and defendants are entitled to a judgment n.o.v. This conclusion, of course, eliminates the need to consider other grounds argued by defendants in their motions for judgment n.o.v. or in the alternative for a new trial.

■ The Court would also like to point out that its decision to grant a judgment n.o.v. does not affect its prior decision to dismiss St. Paul. Although this Court has ruled as a matter of law that CDW discovered dishonest conduct by Barksdale prior to March 25, this discovery does not impose liability on St. Paul because the dishonesty of falsifying the Request for Final Endorsement caused no loss to CDW.

IT IS, THEREFORE, ORDERED that the motions of defendants INA and Hartford for a judgment notwithstanding the verdict be granted for the reasons heretofore stated and the Clerk of Court shall enter judgment for the defendants.

AND IT IS SO ORDERED.

### ORDER

### ON MOTION TO SET ASIDE JUDGMENT N.O.V.

This action was brought to establish the defendants' liability on fidelity bonds issued by them to the plaintiff. After incurring a loss because of dishonest conduct by one of its employees, the plaintiff submitted a proof of loss to each defendant. All of the defendants denied coverage, and the plaintiff then filed this action seeking a declaratory judgment as to which bonds, if any, provided coverage for the loss.

The case was tried before the Court and a jury and resulted in a verdict for the plaintiff against the defendants, Insurance Company of North America (INA) and Hartford Accident and Indemnity Company (Hartford). Thereafter, INA and Hartford duly filed motions for judgment n.o.v. or alternatively, for a new trial. By its Order dated July 8, 1977, this Court granted the motions of INA and Hartford for judgment notwithstanding the verdict.

This matter is now before the Court on the plaintiff's motion for an Order setting aside the judgment notwithstanding the verdict and granting the plaintiff a new trial pursuant to the provisions of Rule 50(c)(2) and 59 of the Federal Rules of Civil Procedure. In its motion the plaintiff contends that the Court erred in holding, as a matter of law, that estoppel and waiver were not applicable and in refusing to submit the issues of estoppel and waiver to the jury under appropriate instructions. After reviewing the evidence and the briefs filed in support of and in opposition to the plaintiff's motion, the Court is of the opinion that the plaintiff's motion, for a new trial must be denied.

As stated in this Court's prior Order of July 8, coverage on the INA and Hartford bonds went into effect on March 25, 1973. The judgment n.o.v. was granted because the Court determined, as a matter of law, that the insured discovered prior to that date that J. L. Barksdale, one of its employees, had committed a dishonest act which voided any fidelity coverage as to him. Plaintiff's argument with respect to the waiver and estoppel issue is based on evidence presented at trial which indicated that, after March 25, the bonding company requested and received a list of C. Douglas Wilson employees on which Barksdale was listed as a vice president. The premium for the fidelity bond was then computed and received after the receipt of this list and after knowledge of the claim. Plaintiff contends that the companies, by computing and accepting the premium with knowledge of C. Douglas Wilson's discovery of Barksdale's dishonesty prior to March 25, waived the bond provision which cancelled coverage "as to any Employee . . . as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee. . . ." (INA bond § 10). Plaintiff further contends that such conduct by the defendant bonding companies estopped them from asserting a defense based on the bond provisions such as the one quoted above.

Although an issue has been raised as to whether South Carolina or North Carolina law applies to this case, this Court will give plaintiff the benefit of any doubt and consider this motion under South Carolina law which is more favorable to the plaintiff. The general rule regarding the application of the doctrines of waiver and estoppel to insurance contracts is stated in *Appleman, Insurance Law and Practice* § 9090 at 341–42 as follows:

> It has been repeatedly held that the doctrine of waiver and estoppel cannot be used to extend the coverage of an insurance policy or create a primary liability, but may only affect rights reserved therein. While an insurer may be estopped, by its conduct or its knowledge or by statute, from insisting on a forfeiture of a policy, under no conditions can the coverage or restrictions on coverage be extended by waiver or estoppel.

*See also State Farm Mutual Automobile Ins. Co. v. Cooper*, 233 F.2d 500 (4th Cir. 1956); *Peters v. Great American Ins. Co.*, 177 F.2d 773 (4th Cir. 1949). Under this general principle the threshold determination to be made is whether the policy condition at issue relates to the extent of "coverage" or whether the violation of the condition causes a "forfeiture" of the policy. The policy provision in this case provides that no fidelity coverage is provided for any employee whom the insured knows to be dishonest. This provision determines whether or not coverage is provided to a particular employee and does not operate as a condition which may give the insurer the right to insist on forfeiture of the policy. *See Frank Gardner Hardware & Supply Co. v. St. Paul Fire and Marine Ins. Co.*, 245 Miss. 320, 148 So.2d 190 (1963).

The bonds in this case are "blanket" bonds. They were purchased by NCNB Corp. long before the acquisition of C. Douglas Wilson and covered a number of risks, one of which was employee infidelity, and applied to hundreds of employees of the various subsidiaries of NCNB Corp. The provision in each bond relating to discovery of employee dishonesty does not cause a forfeiture of the entire bond merely because one employee is discovered to be dishonest. Rather, this provision simply provides that the blanket coverage of the bond does not extend to employees of the insured who are known by the insured to be dishonest. With respect to Mr. Barksdale, the employee at issue in this case, the coverage of the INA and Hartford bonds never included him. When the bonds went into effect on March 25, 1973, Barksdale was not covered under the fidelity provisions of the bonds because C. Douglas Wilson had knowledge that Barksdale was dishonest. Since there was never any coverage as to Barksdale, there was never anything which could be forfeited. If this Court permitted recovery on the bonds for dishonest conduct by Barksdale merely because his name ap-

peared on a list of C. Douglas Wilson employees sent to Hartford and INA and because these lists were used in computing the bond premiums, then the doctrines of waiver and estoppel would be incorrectly applied to extend the coverage of the bond to a person who was never covered.

■ Furthermore, even if waiver and estoppel were a part of this case as a legal issue, this Court was correct in withholding this issue from the jury because of the insufficiency of proof that any waiver actually occurred. Even though the bonding companies had notice of C. Douglas Wilson's discovery of Barksdale's dishonesty prior to the time that the premium was computed, the fact that each company may have used a list of employees on which Barksdale's name appeared does not indicate that each company waived the provision relating to knowledge of employee dishonesty as applied to Barksdale. The fact that no premium was refunded because of the noninclusion of Barksdale does not help plaintiff's waiver argument. It was clear from the testimony at trial that the removal of one employee from the list of hundreds, who were covered by the bond, would either have no effect on the amount of the premium or have an insignificant effect. It is also important to note that the list of C. Douglas Wilson employees was not used by the defendants prior to the effective date of the bond. Rather, the bond was in full force and effect as to all C. Douglas Wilson employees except Barksdale at the time the list was received by defendants. They did not use the list as an underwriting tool of any kind but merely used it to obtain the total number of employees at C. Douglas Wilson and the number of employees who were officers holding certain positions of responsibility. From these figures, the premium on the addition of C. Douglas Wilson to NCNB Corp.'s blanket bond was computed.

■ As stated previously, the "discovery of dishonesty" clause in each of the defendants' bonds is a condition which relates to coverage and not one which creates a forfeiture. South Carolina follows the general rule that coverage under an insurance policy cannot be extended by waiver. *Pitts v. New York Life Ins. Co.*, 247 S.C. 545, 148 S.E.2d 369 (1966). Consequently, the exclusion of the waiver issue from the case submitted to the jury is in accordance with South Carolina law. With respect to estoppel, the South Carolina Supreme Court has departed from the general rule in some cases. *Pitts v. New York Life Ins. Co., supra. See also Preferred Risk Mutual Ins. Co. v. Thomas*, 372 F.2d 227 (4th Cir. 1967). Estoppel may create a primary liability or extend the coverage if the plaintiff can prove the essential elements. The elements which must be proved in order to estop an insurer from denying coverage are:

(1) ignorance of the party invoking it of the truth as to the facts in question; (2) representations of conduct of the party estopped which mislead; (3) reliance upon such representations or conduct; and (4) prejudicial change of position as the result of such reliance.

*Pitts v. New York Life Ins. Co., supra*, 148 S.E.2d at 371. These elements are not present in the instant case. In the first place the plaintiff was not ignorant of the truth as to the facts in question; the fidelity bonds issued by INA and Hartford had been in effect insuring NCNB Corp. for some period of time prior to March 25, 1973, the date the plaintiff was added to the bonds. The plaintiff, through its principal officers, had copies of both the INA and Hartford bonds available to it; plaintiff made a comprehensive study to determine whether coverage should be switched from St. Paul to INA and Hartford; and the plaintiff either knew or certainly should have known that the INA and Hartford bonds expressly exclude coverage for dishonest employees.

In the second place, there is no evidence that either INA or Hartford made any representation to the plaintiffs sufficient to mislead the plaintiff into believing that the exclusionary clause would not apply as to Barksdale or sufficient to form the basis for a claim of estoppel.

Finally, the record is totally devoid of any evidence that the plaintiff relied on any representations or conduct by INA or Hartford and suffered a prejudicial change of position as a result of such a reliance. Even if there were evidence in the case of some representation or conduct by INA and Hartford which caused the plaintiff to believe that the bonding companies would not rely on the exclusionary clauses in the fidelity bonds, there is no evidence whatsoever that the plaintiff suffered any prejudice or would or could have proceeded any differently but for being misled. Thus, under South Carolina law the plaintiff's motion for a new trial must be denied. Waiver is not applicable and, on the undisputed facts in the record, there is no basis for a finding of estoppel.

IT IS, THEREFORE, ORDERED that the motion of the plaintiff for an Order setting aside the judgment notwithstanding the verdict and granting the plaintiff a new trial be and it is hereby denied.

AND IT IS SO ORDERED.