## AMERICAN EMPLOYERS' INS. CO. v. RATON WHOLESALE LIQUOR CO.
### No. 2299.

Circuit Court of Appeals, Tenth Circuit.
Oct. 29, 1941.

Allen R. Grambling, of El Paso, Tex. (A. K. Montgomery, of Santa Fe, N. M., on the brief), for appellant.

Fred C. Stringfellow, of Raton, N. M., for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

PHILLIPS, Circuit Judge.

The Raton Wholesale Liquor Company[1] was a partnership composed of C. Vincioni, Joe DiLisio, and Pete Matteucci.[2] Since March 1, 1939, it has engaged in the wholesale liquor business selling distilled liquors, wines, and beer. About March 1, 1939, it employed O. J. Moon as salesman and collector. His territory embraced seven counties in Southern New Mexico. His duties were to take orders for liquor, transmit them to the Raton Company's office at Albuquerque, New Mexico, and after the orders were filled, collect the amounts due therefor. Moon was also a stockholder, vice-president, and manager of the Up-To-

---

[1] Hereinafter called the Raton Company.

[2] Charles DiLisio became a member of the copartnership after this action was commenced.

284

Date Liquor Company [3] which engaged in the sale and distribution of beer at wholesale. Moon did not sell beer for the Raton Company. Moon made weekly reports and remittances of his collections. For a time he forwarded the proceeds of collections in cash and customers' checks. After five or six weeks he deposited the cash and checks received in a bank at Hatch, New Mexico, and remitted to the Raton Company either his personal check or the check of the Up-To-Date Company to cover the collections made. During the period between May 11, 1939, and January 1, 1940, fourteen of the checks so remitted were returned to the Raton Company on account of insufficient funds. However, Moon communicated with the Raton Company respecting each of such checks and advised the reason for its dishonor. Usually, it was because checks from customers that he had deposited to cover the check remitted to the Raton Company had been dishonored. All of the fourteen checks were eventually honored and paid.

Checks remitted by Moon on January 3, 10, 17, 25, and February 2 and 8, 1940, respectively, aggregating $8,452.51, were dishonored, and were not paid. Shortly prior to January 31, 1940, the Raton Company received information that led it to suspect Moon was misappropriating funds collected from its customers. Prior to that time, it had received no information that led it to suspect Moon. Mr. Matteucci, one of the partners, went to Hatch, and Moon confessed to him that he did not have the money to cover the checks and that he had used it for other purposes. On April 7, 1940, Moon admitted to Mr. Stringfellow, attorney for the Raton Company, that he did not have the money to cover checks aggregating $8,452.51.

After the first six weeks of his employment, Moon endorsed customers' checks which he collected and deposited them to his personal account or the account of the Up-To-Date Company.

On March 1, 1939, the American Employers' Insurance Company [4] executed to the Raton Company its fidelity bond in the sum of $10,000, in which it bound itself to pay the Raton Company "the amount of any pecuniary loss which any Employee named in the schedule" [5] thereto attached "may, while in any position and at any location in the service of the" Raton Company "alone or in collusion with others, cause to the" Raton Company "through any act of fraud, dishonesty, forgery, theft, larceny, embezzlement, misappropriation, wrongful abstraction, or wilful misapplication committed during the one year term commencing on the 28th day of February, 1939." The bond was received by the Raton Company on March 3, 1939.

On March 8, 1939, the Raton Company executed and delivered to the Insurance Company an employer's statement which in part read as follows:

"Questions. | Answers.
A. State position of Applicant, the duties that will devolve on him and whether authorized to endorse checks. | A. Salesman and collector. Will not endorse checks.

\* \* \* \* \*

"We declare that the above statements are true, and we agree that these statements and any further statements referring to this bond signed by us shall be taken as the basis of the contract between us and the above-named Corporation."

The bond made no reference to the employer's statement.

On February 6, 1941, the Raton Company notified the Insurance Company in writing of Moon's defalcations and in due time made due proof of claim. The Insurance Company denied liability on the ground that Moon had endorsed checks of the Raton Company and had failed to give timely notice of the defalcations.

The Raton Company brought this action to recover on the bond the amount of Moon's defalcations. From a judgment in favor of the Raton Company for $8,452.51, the Insurance Company has appealed.

The trial court found that Moon wrongfully abstracted and misappropriated $8,452.51 of the proceeds of collections made by him for the Raton Company; that the fact he was permitted to endorse checks payable to the Raton Company received as collections did not affect the risk or in-

---

[3] Hereinafter called the Up-To-Date Company.
[4] Hereinafter called the Insurance Company.

[5] Moon was the only employee named in the schedule.

crease the hazard of the Insurance Company; and that prior to January 31, 1940, the Raton Company was not aware of any misappropriation, wrongful abstraction, or wilful misapplication upon the part of Moon.

In Zolintakis v. Equitable Life Assurance Society, 10 Cir., 97 F.2d 583, 586, we said:

"A warranty in the law of insurance is a statement or stipulation in the policy which is breached unless absolutely true or literally fulfilled. A warranty may be either affirmative or promissory. The former affirms the existence of a fact at the time the policy is entered into; the latter requires that something be done or not done after the policy has taken effect. A breach of warranty avoids the insurer's liability under the policy. Sentinel Life Insurance Co. v. Blackmer, 10 Cir., 77 F.2d 347, 350.

"In the law of insurance a misrepresentation by the insured is an oral or written statement of a material fact or condition affecting the risk made by the insured to the insurer which precedes and is not a part of the contract, unless it is expressly stipulated that it shall be, and is either intentionally untrue or made with a reckless disregard for its truth or falsity. Sentinel Life Insurance Co. v. Blackmer, supra.

"A misrepresentation will not constitute a defense to an action on a policy of insurance unless it was intentionally untrue or was made with a reckless disregard for its truth or falsity."

■ Where a policy of insurance has been issued without a written application and without an agreement to execute one afterwards, an application subsequently delivered is not a part of the contract of insurance.[6]

■ Here, the application was issued subsequent to the bond. It was not given as an inducement for the execution and delivery of the bond, was not referred to therein, and constituted no part of the bond. Therefore, the quoted statement in the application was not a warranty and constituted at most a mere representation.[7]

The evidence did not justify a finding that the statement when made was intentionally untrue or fraudulent. It was true when made and it was not then contemplated that Moon would endorse checks payable to the Raton Company which he received in making collections.

■ Furthermore, Moon was authorized to make collections. He was authorized to receive cash, checks payable to himself, or checks payable to the Raton Company. Under these circumstances, we do not think it can be said that the finding of the court that the endorsement of the checks by Moon did not materially affect the risk was clearly erroneous.

The bond required the Raton Company to give notice by registered mail to the Insurance Company as soon as possible after becoming aware of any act committed by an employee which might be made the basis of a claim under the bond.

■ The finding of the trial court that the Raton Company did not have notice of any defalcation on the part of Moon prior to January 31, 1940, is supported by the evidence and is not clearly erroneous. Indeed, Moon accounted for all the funds collected prior to January 1, 1940, and his explanation of the dishonored checks was reasonable under all the circumstances and the Raton Company was justified in accepting such explanation. Furthermore, the Raton Company was not required to report merely suspicious conduct, but rather only knowledge which would justify a careful and prudent man in charging another with fraud or dishonesty.[8]

The judgment is affirmed.

[6] Cooley's Briefs on Insurance, Vol. 2, p. 1071;

Loyal Mutual Fire Ins. Co. v. J. S. Brown & Bro. Merc. Co., 47 Colo. 467, 107 P. 1098, 1099;

Sohn v. New York Indemnity Co., 340 Ill. 129, 172 N.E. 57, 59;

Michigan F. & M. Ins. Co. v. Wich, 8 Colo.App. 409, 46 P. 687, 688;

Colorado L., M. & M. Co. v. Palatine Ins. Co., 57 Colo. 235, 141 P. 860;

Le Roy v. Park Fire Insurance Co., 39 N.Y. 56.

[7] Maryland Casualty Co. v. Tulsa Industrial Loan & Inv. Co., 10 Cir., 83 F.2d 14, 16, 105 A.L.R. 529, and cases there cited;

Transcontinental Insurance Co. v. Stanton, 7 Cir., 74 F.2d 935, 937.

[8] American Surety Co. v. Pauly, 170 U. S. 133, 145, 18 S.Ct. 552, 42 L.Ed. 977; Note, 129 A.L.R., p. 1412.