The **HIDDEN SPLENDOR MINING COMPANY**, Appellant,

v.

**GENERAL INSURANCE COMPANY OF AMERICA**, Appellee.

No. 8223.

United States Court of Appeals
Tenth Circuit.

Dec. 23, 1966.

---

Charles Spann, of Grantham, Spann & Sanchez, Albuquerque, N. M., and John A. Guzzetta, of Simpson, Thacher & Bartlett, New York City, on brief, for appellant.

K. Gill Shaffer, of Shaffer, Butt & Bass, Albuquerque, N. M., for appellee.

Before MURRAH, Chief Judge, and ALDRICH* and HILL, Circuit Judges.

MURRAH, Chief Judge.

In this diversity suit Hidden Splendor Mining Co. (successor of Rio de Oro Uranium Mines, Inc.) seeks to recover

* By Designation.

from its bonding company for fraudulent appropriations of corporate assets by a corporation employee. The trial court, sitting without a jury, held that the prerequisite notice provisions of the bond had not been complied with, and accordingly entered judgment for the bonding company. We think the trial court was plainly right.

█ The bonding company-appellee, General Insurance Co. of America, agreed to indemnify "against any loss * * * which the Insured shall sustain * * * to an amount not exceeding in the aggregate the sum of * * * $50,000 through any fraudulent or dishonest act or acts committed by any one or more of the Employees [of the Insured] * * *." This agreement was subject to a number of "Conditions and Limitations", among which was the following:

"At the earliest practical moment, and at all events not later than fifteen days after the discovery of any fraudulent or dishonest act on the part of any Employee by the Insured, or by any partner or officer thereof not in collusion with such Employee, the Insured shall give written notice thereof and within four months after such discovery shall file with the Underwriter affirmative proof of loss, itemized and duly sworn to * * *."

The uncontroverted fact is that prior to the October, 1959, merger of Rio de Oro into Hidden Splendor, one W. Rodney DeVilliers (while acting as president of Rio de Oro) fraudulently appropriated to his own use and benefit Rio de Oro assets in excess of $50,000.[1] Whether Hidden Splendor complied with the notice provision turns on when it "discovered" the admitted fraud. The test of when one has "discovered" a fraudulent act is not in dispute—both parties rely on American Employers' Ins. Co. v. Raton Wholesale Liquor Co., 10 Cir., 123 F.2d 283. There the court sets out the rule that " * * * the Raton Company was not required to report merely suspicious conduct, but rather only knowledge which would justify a careful and prudent man in charging another with fraud or dishonesty", Id. 285, citing American Surety Co. v. Pauly, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977. See also Ipava Farmers Elevator Co. v. Hawkeye-Security Ins. Co., 7 Cir., 222 F.2d 833; Hunt v. Fidelity and Deposit Co. of Maryland, 3 Cir., 92 F.2d 75; B. Constantino and Sons Co. v. New Amsterdam Casualty Co., 7 Cir., 234 F.2d 902; Brown v. Maryland Casualty Co., 111 Vt. 30, 11 A.2d 222, 129 A.L.R. 1404; Gilmour v. Standard Surety and Casualty Co., 292 Mass. 205, 197 N.E. 673; Anno. 129 A.L.R. 1411; Anno. 23 A.L.R.2d 1065, § 6, p. 1076.

The pertinent facts are that on January 30, 1960, the accounting firm of Ernst and Ernst, engaged in an audit of the Rio de Oro books, addressed a letter to Mr. Edward Farley, an officer of Hidden Splendor, in which certain transactions involving DeVilliers and Rio de Oro were questioned. Specifically the letter stated:

"The first and largest transaction in this connection is * * * the San Mateo Dome deal. I am not intimately familiar with this matter, having only the general understanding that Mr. DeVilliers owned an interest in a certain block of mining leases in the San Mateo Dome area * * *, and that the purchase price and payments made by Rio de Oro Uranium Mines, Inc., totaling $375,000 * * * were in accordance with an agreement previously reached in 1957 or early 1958 between Mr. DeVilliers and Mr. Odlum, and/or others in your company."

The letter indicated that no corporate authorization for this sale could be found, and that the Rio de Oro files did not contain instruments of conveyance for San Mateo Dome claims. The letter further questioned certain unauthorized retroactive salary payments to DeVilliers.

---

1. In DeVilliers v. Atlas Corp., 10 Cir., 360 F.2d 292, which was consolidated with our case for trial, a judgment against DeVilliers in excess of $400,000 was affirmed by this court.

Soon after receipt of this letter, Farley consulted Mr. Floyd Odlum, chief executive of Hidden Splendor and of Atlas Corporation, the parent corporation of Rio de Oro during the period when the fraud occurred. Neither Odlum nor Farley knew of any agreement for Rio de Oro to purchase San Mateo Dome claims from DeVilliers and it was determined on February 4 to retain a second accounting firm, Lybrand, Ross Bros., and Montgomery, to further investigate the matter.

On February 7 Farley had a telephone conversation with DeVilliers. When asked whether he had sold San Mateo Dome claims to Rio de Oro, DeVilliers' reply was "no".

The Lybrand report, issued on February 23, supported the Ernst and Ernst report, specifically stating that "Purchase of the San Mateo Dome * * * claims lacks approval of the board of directors of Rio de Oro. Lease assignments, deeds and contract to purchase do not appear to be contained in Rio's files."

Following receipt of the Lybrand report, Farley attempted to meet with DeVilliers to obtain an "explanation" for the Ernst and Ernst and Lybrand reports. They met March 3. DeVilliers maintained he could explain the discrepancies in the two reports and promised to meet Farley the next day to supply the explanation. DeVilliers did not keep the appointment. It was then determined to change the locks on the doors of the Rio de Oro offices in Albuquerque, and this was done on the evening of March 4.

More attempts to get an "explanation" from DeVilliers followed. At a meeting on March 11 attended by DeVilliers, Odlum and Farley, DeVilliers could offer no explanation. The meeting resulted in a written agreement in which DeVilliers affirmed that he had sold no interest in the San Mateo Dome claims to Hidden Splendor or its predecessor, Rio de Oro; he further agreed to resolve certain "differences and misunderstandings" by paying Hidden Splendor $440,000, evidenced by a note to be secured within ten days. The security was not forthcoming. On March 25 Farley and Hidden Splendor's attorney met with appellee's agent and gave oral notice of the facts then known by Hidden Splendor. It was made clear, however, that Hidden Splendor was not then asserting a claim under the bond for the reason that if DeVilliers performed the March 11 agreement, no loss would have been suffered. By letter dated April 5, DeVilliers repudiated the March 11 agreement. On April 9 Hidden Splendor wrote appellee's agent to give notice that "* * * we are now asserting a claim for the full extent of the coverage of said bond."

The trial court found that the first attempt by Hidden Splendor to give notice of discovery of a fraudulent or dishonest act was made at the March 25 meeting. It further found that more than fifteen days prior thereto, Hidden Splendor had notice of facts "* * * sufficient to put any reasonably prudent person on notice that a fraud had been committed * * *"; that more than fifteen days prior thereto Hidden Splendor had "* * * concluded that the acts of its employee constituted a fraud which could lead to a claim under the bond, but plaintiff did not give notice to defendant, preferring instead to seek restitution through negotiations and an agreement with Mr. DeVilliers." The trial court's findings clearly read on the Raton test. The only question is whether these findings and conclusions can be said to be clearly erroneous.

■ Hidden Splendor attacks the findings as being without substantial support in the record. (Included in this attack is the finding that the first attempt to give notice was made on March 25. We have been referred to no evidence whatsoever that an attempt was made prior to that date, and we have been unable to find any. We, therefore, accept that finding as substantially supported by the record.) It asserts that it did not "discover" DeVilliers' fraudulent acts until March 11 at the earliest, for it was only then that it became clear he could not

explain the reports. Indeed, Hidden Splendor contends that it did not "discover" the fraud until April 5 when De-Villiers repudiated the March 11 agreement, the reason being that the March 11 agreement was to resolve "differences and misunderstandings" and not fraud, and therefore not until the agreement was repudiated did the fraud become decisively clear. Hidden Splendor maintains that prior to these two dates, all it had were mere suspicions of fraud which need not be reported to the insurer. It argues that, after all, DeVilliers was a trusted employee, and the enormity of the amount involved required that Hidden Splendor try to obtain an explanation from DeVilliers before reporting to the insurer that he had committed dishonest acts.

█ If either of the eventful dates, i. e. March 11 or April 5, was the date Hidden Splendor "discovered" the fraud, then the March 25 attempt to give notice was within the fifteen day period provided for by the bond. But, we agree with the trial court that it either knew or had reason to believe that DeVilliers had committed a fraud well before either of those dates. The January 30 and February 23 reports revealed to Hidden Splendor officials that $375,000 had been paid to DeVilliers for San Mateo Dome claims without authorization, and without receiving instruments of conveyance for the claims. The February 7 telephone call made it clear that DeVilliers was not even claiming to have sold San Mateo Dome claims to Rio de Oro. The failure to keep the March 4 appointment was viewed so seriously by Hidden Splendor officials that they moved to have the locks changed on the Rio de Oro offices in Albuquerque. The following testimony by Farley on cross-examination is instructive:

" * * * we had been attempting to have Mr. DeVilliers explain this to us; he had told me in Washington that he could and would—he said he would come to New York for that purpose, and, instead, we found that he had gone to Albuquerque, and at this point we thought that we had better protect the books and records in the Rio office, and we had the locks changed by our man there."

"Q. Because you were afraid that some fraud had been committed?

"A. I suppose at that point we got concerned about fraud, but I never thought about fraud or any other term, at this point."

We think these facts entirely sufficient to alert a reasonably prudent person that a fraud had been committed.

Hidden Splendor's remaining contentions relate to the court's Conclusion of Law to the effect that "The defendant has not waived its objection to failure to comply with the provision of the bond as to notice, which provision is a condition precedent to liability on the part of the defendant." As to waiver, Hidden Splendor seeks to establish that the oral notice given March 25 was effective and that appellee waived its right to notice in writing. But, as we have seen, even if the March 25 notice was effective, it still came too late.

█ On oral argument Hidden Splendor attacked for the first time the basic conclusion of the trial court that notice of discovery of fraudulent acts was a condition precedent to appellee's liability under the bond. Ordinarily, we would neither be "constrained nor inclined" to consider a theory advanced for the first time on appeal, i. e. see Diggs v. Cities Service Oil Company, 10 Cir., 241 F.2d 425. But, the trial court did make a specific finding on this basic issue at the request of the appellee, and since that finding is basic to the court's ultimate conclusion on the question of notice, we have taken note of the authorities submitted by Hidden Spendor since oral argument.

Hidden Splendor relies on a Mississippi case in which that court held that

compliance with a notice provision indistinguishably similar to ours is not a condition precedent to liability and that the provision cannot be availed of by the insurer absent a showing of prejudice due to noncompliance. See Hartford Acc. & Ind. Co. of Hartford, Conn. v. Hattiesburg H. Stores, Miss., 49 So.2d 813, 23 A.L.R.2d 1053, and cases cited therein. There is a split of authority on this question, however, and the clear weight of the cases appears to be on the side of the trial court. See Anno. 23 A.L.R.2d 1065, §§ 3, 5; Couch on Insurance, §§ 49.217, 49.237; Appleman on Insurance, §§ 6192, 6193; J. S. Fraering, Inc. v. Employers Mut. Liab. Ins. Co. of Wis., 242 F.2d 609, where the Fifth Circuit enforced a provision indistinguishably similar to ours under Louisiana law without requiring a showing of prejudice.

■ New Mexico has not ruled on whether notice under such a provision is a condition precedent to a fidelity insurer's liability. However, they have construed their standard statutory fire insurance policy. See Zengerle v. Commonwealth Insurance Co. of N. Y., 63 N.M. 454, 321 P.2d 636.[2] Despite the well-settled rule, equally applicable to fire and fidelity insurance, that the terms of an insurance contract are to be liberally construed in favor of the insured, i. e. see Couch on Insurance, §§ 15.74, 15.76; Appleman on Insurance, §§ 7462, 7504, the New Mexico court in Zengerle tersely held that "The requirement of notice and filing proofs of loss is a condition precedent to the insurer's liability * * *". We are satisfied that the trial court correctly applied New Mexico law.

The judgment is affirmed.

2. 58–8–10, New Mexico Stat. Anno., provides in pertinent part:
"REQUIREMENTS IN CASE LOSS OCCURS. The insured shall give immediate written notice to this company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed; and within sixty [60] days after the loss, unless such time is extended in writing by this company, the insured shall render to this company a proof of loss, signed and sworn to by the insured * * *."