SECURITY NATIONAL BANK OF KAN-
SAS CITY, KANSAS, Plaintiff,

v.

The CONTINENTAL INSURANCE
COMPANY, Defendant.

Civ. A. No. 80–2287.

United States District Court,
D. Kansas.

Sept. 10, 1982.

Kenneth J. Reilly, Boddington & Brown, Kansas City, Kan., for plaintiff.

Donald A. Hardy, Williamson, Cubbison, Hardy & Hunter, Kansas City, Kan., Douglas Stripp, James F. Duncan, Watson, Ess, Marshall & Enggas, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

O'CONNOR, Chief Judge.

In this case plaintiff seeks recovery from its bonding company under a Bankers Blanket Bond for a loss of nearly one million dollars resulting from a check kiting scheme. Trial was held to the court from June 21 thru June 24, 1982. After considering the evidence, the briefs and arguments of counsel, we render the following decision.

### Findings of Fact

Plaintiff, Security National Bank (SNB), is located in downtown Kansas City, Kansas. Defendant issued a Bankers Blanket Bond covering losses by the bank over $25,-000, with certain limitations. Richard T. Mitchell and Howard W. Oetting were the principals of M.O.B. Investment Company (MOB), a holding company for five subsidiaries: Sexton Printing Company, Mid-Western Lithoplate Co., Kansas City Central Paper Box Company, Hyer Boot Co., and

Tower Studios, Inc. Other companies owned by Mitchell and Oetting, although not directly involved in the activity at SNB, included Hyer Equipment, Capital Equities, Inc., Union Petrochemicals, and M & O Enterprises. Mitchell and Oetting are presently incarcerated following convictions in this court based upon their activities in defrauding SNB. In addition to their accounts at SNB, Mitchell and Oetting maintained accounts for their various enterprises at Overland Park State Bank (5 accounts), First National Bank of Olathe, and Mark Plaza Bank, Raytown.

During the period of time Mitchell and Oetting were "customers" of SNB, Ramey Beachley was Executive Vice-President and Senior Loan Officer, and in charge of the MOB loans with the bank. Stanley Griffin was an Assistant Vice-President who had previously been in charge of data processing at SNB, and had been transferred to the commercial lending department in February of 1976. The Hyer Boot Co. loan with SNB was his responsibility. Above Beachley and Griffin in the official hierarchy was R.R. Domer, Assistant to the President, and Gray Breidenthal, President.

An overview of the demand deposit accounting system of SNB will help in understanding how the events of September through December 1976 occurred. SNB's data processing was done by Systematics, Inc. Items of debit and credit (the majority of which were checks) were sent after receipt by the bank to the transit department, where magnetic codes were added to the lower edge of the checks. The bank's code number and the account number were preprinted on the checks. The checks and other items were then "run" through the computer processing: credits were posted to the account first; then items coded "27," or "force pays" next; followed by items coded "28," debit memos from SNB, such as service charges; then code "31" checks—those cashed over-the-counter at SNB; and finally code "35" checks—those coming from another bank or deposited over-the-counter but not cashed, and drawn on an account at SNB. If a code "35" check would cause an overdraft, or if for some other reason the check could not be posted or debited against the account, the item would be "rejected" by the computer and was listed by amount and account number on the Posting Reject Journal delivered daily to the bookkeeping department. The computer would automatically cause an NSF (not sufficient funds) notice for the customer to be printed.

In the summer of 1974, Mitchell and Oetting applied for credit on behalf of the MOB companies at SNB. MOB was referred to SNB by Ray Evans, of Trader's National Bank in Kansas City, Missouri. Evans, in addition to being a banker and substantial customer of SNB himself, was the son-in-law of Harry Darby, a highly regarded customer of SNB. On the basis of Evans' recommendation, SNB loaned $800,000 to MOB. Although SNB officials knew that MOB had been banking at Traders National Bank prior to that time, no inquiry was made to anyone at Traders about its credit history. No independent audit was required, nor were any Dun and Bradstreet or other trade reports requested. Much later, of course, it was discovered that Mitchell and Oetting had been engaged in a large kiting operation at Traders. After discovery of that scheme, Traders' officials cut off further credit to Mitchell and Oetting and requested them to obtain bank financing elsewhere to retire their indebtedness to Traders. The "recommendation" to SNB soon followed.

In addition to the loan account at SNB, MOB and its subsidiaries each opened separate checking accounts at the bank. In August of 1975, Francis Lemmery, Cashier of SNB, uncovered a suspected check kiting scheme by MOB and subsidiaries between SNB and an Olathe bank. Lemmery informed Domer, who conferred with the President, Breidenthal; the Chairman of the Board, W.L. Webber; and Beachley. Domer and Webber wanted to get MOB and its subsidiaries out of the bank as customers, but Breidenthal and Beachley, the loan officer in charge of MOB loans, voted to keep them. No effort was made at the time to contact Traders National

Bank to inquire about that bank's experience with MOB. Mitchell and Oetting were called to the bank and given a stern lecture by Beachley on the subject of check kiting. No policy requiring the special scrutiny of MOB accounts was subsequently implemented however.

Late in 1975, Beachley received an inquiry from the SEC regarding MOB. Apparently this event did not trigger any special examination of the MOB accounts by bank officials.

In January 1976, the MOB account and five subsidiary accounts at SNB were consolidated into one account, 0201839. Although Domer testified that this was a kiting-prevention step, Beachley stated that the accounts were consolidated simply in an effort to help the MOB companies avoid overdrafts. In response to Mitchell's and Oetting's request, SNB allowed each company to retain its logo and separate identity by check color, although the account number encoded on the bottom of all checks was the same for each company.

In March 1976, Griffin, who had just been transferred to commercial lending the previous month, discovered a second suspected kite by Mitchell and Oetting. Griffin testified that he happened to look at some items of deposit by the MOB companies which were checks drawn on other banks by the same companies. Domer was notified and Mitchell and Oetting were again called to the bank for a conference with Domer, Webber, and bank counsel. The MOB principals explained that loan proceeds of $25,000 obtained from another source had not yet been received, although they admitted that the checks written in anticipation of the receipt of the proceeds would create an overdraft if paid. Domer verified the fact that a $25,000 loan was to be made to MOB, and then had Mitchell and Oetting execute a temporary note and deposit the proceeds into the account to cover the insufficiency.

The following month, MOB defaulted on its loan with SNB, leaving a balance of approximately $675,000 due. Only one other partial payment, in June of 1976, was subsequently made on this note. Griffin testified that although on the one occasion that he checked an MOB deposit he discovered a suspected kite, he never again thought to check any items of deposit by MOB and the related companies.

In May of 1976, Beachley attempted unsuccessfully to arrange refinancing for the MOB loan, and learned that MOB was in arrears to the Internal Revenue Service in the amount of $300,000.

During the first six months of 1976, the MOB consolidated account would occasionally appear on SNB's "Posting Reject Journal." Rita Ryan, then head bookkeeper, and her assistant, Phyllis Coyle, would pull the rejected checks and the NSF notice and take one or both to either Beachley or Griffin for instructions.[1] Invariably, the order given was that if a deposit sufficient to cover the overdrafts from the previous day was made before 12:00 or 1:00 p.m., the rejected checks were to be coded "27" and sent through the computer processing system again for posting. On the first occurrences, Griffin or Beachley would notify Mitchell or Oetting by telephone of the amount of the overdrafts. Later that day, when Coyle or Ryan received a call from the teller that an MOB deposit had been made, the bookkeepers would manually code the items "27" and sent them to the transit department for reprocessing. At some point in July or August 1976, Griffin, upon direction from Beachley, instructed Coyle and Ryan that review by an officer was not necessary on MOB overdrafts--if a sufficient deposit was made in time, the standing order was to pay the NSF items. No effort was made by Griffin or Beachley or the bookkeepers to examine the covering deposits in detail at any time.

---

1. When a check was rejected as NSF, one of three things could occur, depending on the identity of the customer. On the majority of accounts, the item would be automatically returned. For a very few accounts, the item would automatically be paid. MOB and other commercial customers fell in the middle category of accounts, where a bank officer could approve payment even though an overdraft would result.

Thereafter, the practice developed whereby early in the morning a bookkeeper would receive a call, usually from Oetting, asking for the total amount of the previous day's overdrafts. A messenger from MOB would arrive at the bank before 1:00 p.m. with a deposit sufficient to cover the previous day's overdrafts. The teller immediately called the bookkeeping department with the total amount of the deposit. When making a deposit, the messenger never received cash or a cashier's check from the teller for any of the items presented for deposit. The messenger would usually, but not always, stop by Rita Ryan's desk and show her or Phyllis Coyle an adding machine tape with the total amount of the deposit, to double-check the teller's information telephoned earlier to the bookkeeping department. The bookkeepers both testified, however, that they in no way relied upon the tape shown them by the messenger but relied only on the teller's representation, before writing "27" on the checks. Starting in early September, this procedure was followed on a *daily* basis. After the bookkeepers coded the checks and sent them to the transit department, it would have been difficult, but *not impossible,* to recover the checks manually and return them unpaid.

The majority of the checks deposited to "cover" the previous day's NSF items were, to use Rita Ryan's term, "trash"—checks drawn on and deposited to the same account, 0201839. Since no one at the bank was really monitoring the MOB account, this scheme of intra-account check kiting allowed Mitchell and Oetting to relieve the bank of nearly one million dollars over a period of four months in the latter half of 1976. This was accomplished by Mitchell's and Oetting's knowledge of the bank's internal procedures and by their taking advantage of perceived deficiencies in SNB's operations.

On any given day, the computer would first post to account number 0201839 all credits consisting of credit memos and various checks deposited by MOB and subsidiaries to the account. The majority of these checks were "false deposits," *i.e.* checks drawn on, and deposited to, account 0201839. These checks were a "wash" according to accounting principles, since each credit had a corresponding debit. But since the computer posted these "credits" first, a high positive balance existed in the account so that the previous day's NSF items, now coded "27" for forced payment, could be debited next. Most of these code "27" items from the previous day were also intra-account checks, but some were checks paid to third parties, and a few were checks made payable to MOB or subsidiaries deposited by them in one of their five accounts at Overland Park State Bank.[2] After all the previous day's NSF code "27" items were debited, the current day's debits, checks drawn on account 0201839, would be "presented" by the computer for payment from the account. Since the illusory credits created by the intra-account checks would have been depleted by the code "27" items from the previous day, there would not be sufficient funds available to post the current day's debits. These debits would then be rejected by the computer as "suspense items," and would be listed on the "Posting Reject Journal" the following morning. Throughout the months of September through December, the MOB NSF checks formed the major part of the bank's total amount of suspense items, and the amounts increased steadily.

An outline of a typical day's activity in this account is illustrative of the scheme:

The morning of November 1, 1976, the account balance for MOB was $883.49. The previous day's computer run had rejected $436,894 of suspended debits, of which total $341,967 came from account number 0201839 of MOB. On November 1, 1976, the credits of the day were posted first:

1. Valid Deposits:
   by MOB and subsidiaries from outside parties, totalling . . . . . . . . . . . . $ 19,460
2. False Deposits:
   by MOB and subsidiaries from MOB or subsidiaries intra-account number 0201839, totalling . . . . . . . . . . . . . . . $257,606

---

2. These checks deposited by MOB in other banks were part of a "normal" check kiting scheme, that is, utilizing the processing time between two banks as "float time," during which the kiter draws against uncollected funds.

3. Probable Check Kiting Deposits:
   by MOB and subsidiaries drawn on
   one of their accounts at Overland
   Park State Bank, totalling . . . . . . . . $ 62,213

   TOTAL CREDITS . . $358,740

The same day, the following items were presented for payment from account number 0201839:

1. Checks drawn by MOB and subsidiaries payable to themselves

   A. deposited by them to one of their accounts at Overland Park State Bank . . . . . . . . . . . . . . . $ 32,490

   B. deposited to their SNB account number 0201839 . . . . . . . . . . . . $289,163

2. Checks payable to Capital Equities (a related company) . . . . . . . . . . . . . . . . . . . $ 17,111

3. Checks payable to outside parties . . . . . . $ 16,618

4. Debit memos . . . . . . . . . . . . . . . . . . . . . . $ 2,053

   TOTAL DEBITS . . $357,435

The account balance at the end of November 1, 1976 was $2,184.23.

The credits of $358,740 were posted first, then the previous day's NSF items now coded "27," totaling $341,967, were debited. A few of the new debit items would clear, but the remainder would be rejected by the computer as suspense items. The account still showed a positive balance of $2,184.23, since the computer would not automatically debit the current day's checks which were not yet coded "27" (the "forced pay" code). These checks became the next day's suspended debits, which would be coded "27" upon receipt of a new deposit.

This sequence happened day in and day out, with the amounts increasing dramatically in November and December. As we have noted, the net effect from a bookkeeping standpoint of the intra-account checks was zero—offsetting credits and debits to the same account—but, because SNB officers allowed the prior day's NSF items to be paid from the current day's uncollected deposits, the intra-account checks created a "float" of one day. This allowed third-party checks to be debited when there was no *real* credit existing in the account—only the false credit appearing when the intra-account checks were credited. Those checks paid to parties *other* than MOB and

its subsidiaries constituted the loss suffered by the bank.

From September 1, 1976, until discovery, a total of $38,694,436.40 of checks and other debits were charged to the account. During the same time, $37,704,132.94 of checks were deposited. Of these, $29,641,-758.20 were checks drawn on and paid to account number 0201839, and constituted "wash" transactions. After discounting bank service charge debits, etc., a total loss of $974,558.36 is claimed by the bank.

The data processing programs utilized by Systematics, Inc., for the bank and the bookkeeping department in particular produced numerous reports on a daily basis. One was a "Statement of Condition," distributed to senior officers. This report showed on a daily basis, the growth of the unposted suspense debits. On October 7, 1976, the total unposted debits in the bank were $143,192.84—by December 31 they were $1,062,081.01. After returning from a vacation in November 1976, Breidenthal noticed the unusually high suspense debits and asked Domer to find out what the items were and whether they "cleared out" every day. According to Breidenthal's testimony, Domer reported back that everything was fine, although Domer testified he does not recall the event.

A report, "Overdrafts and Drawings on Uncollected Funds," was also generated by the computer. Although distributed to some officers, it apparently was not reviewed by them on a regular basis. Domer, Griffin and Beachley, however, each testified that they received daily a typed Overdraft Report prepared by bank personnel from the computerized report. Breidenthal received this also, but did not examine it every day. Beachley in particular stated that he looked at this report for *unusually large amounts* or *his own loan customers.*

None of these witnesses recalled seeing MOB on the overdraft list, not even Beachley, who was the loan officer in charge of the MOB loan with knowledge that the loan was in default, that MOB had a history of suspected check kiting, and that Mitchell

and Oetting were currently in a strained financial situation. MOB overdrafts appeared prominently in the report, especially in September. The MOB overdrafts as listed in the report are as follows:

| | | |
|---|---|---:|
| June | 7, 1976 | $ 1,564.79 |
| | 8 | 4,202.69 |
| | 10 | 5,209.71 |
| July | 13 | 8,226.49 |
| Aug. | 2 | 17,146.32 |
| | 3 | 53.97 |
| | 17 | 6,261.61 |
| | 18 | 13.31 |
| | 20 | 2.79 |
| | 27 | 10,710.32 |
| | 31 | 43.47 |
| Sep. | 2 | 26,374.08 |
| | 15 | 36,412.43 |
| | 17 | 3,275.83 |
| | 22 | 1,250.14 |
| | 23 | 66,179.69 |
| | 28 | 7,778.69 |
| Oct. | 7 | 898.61 |
| | 8 | 1,629.51 |
| | 15 | 14,107.06 |
| | 19 | 9,344.46 |
| | 26 | 17,751.61 |

The MOB overdrafts, with a few exceptions, were noticeably larger than those of other customers appearing on the list. The minutes of the October 12, 1976 Board of Directors' meeting reflect that in the report to the directors on overdrafts of "over $100," MOB was listed as having overdrafts of $10,978.76 as of September 30, 1976. At this same meeting the delinquent status of the MOB *loan* was also discussed. In fact, the deplorable state of the MOB loan was discussed at every board meeting from April 1976 to December 1976, with the possible exception of June. The loan had been classified as "substandard" by the bank examiners, and was candidly described as the "worst" loan in the bank.

Another computer-generated report was "Drawing on Today's Deposits." The senior officers of the bank did not examine this report at all and were generally unaware of its existence, even though the Systematics manual pointedly referred to the accounts listed as "kite suspects." The fact that this report, if reviewed, would have aroused suspicions regarding the MOB account, is amply demonstrated by a sample:

December 22, 1976:

| | |
|---|---:|
| MOB's Current Balance: | $ 2,427.60 |
| Debits Today: | $954,152.43 |
| Deposits Today: | $947,787.54 |

When Rita Ryan, the head bookkeeper, made known her concern about the MOB account to her superiors, she met with no response. Even a cursory examination of the typed overdraft report would have provided the bank officers, especially Beachley, with sufficient facts to prompt further inquiry. Moreover, the bank already had knowledge of Mitchell's and Oetting's check kiting propensities, as well as MOB's loan delinquency and its shakey line of credit. All information necessary to discover this scheme was readily available to officers of SNB from reports internally generated by the bank.

The discovery of the scheme was inadvertent. Domer went to the bank the weekend of January 1, 1977, to work on the bank's annual report. He noticed the unusually large total of suspense debits. Needing to decide how they would be shown in the annual report, he asked to see the individual suspense items. When he looked at the MOB deposits, he discovered that the account numbers on the deposit tickets and the checks were identical. Beachley was called in, and he in turn called Mitchell and Oetting. Apparently, Oetting knew the amount of the overdraft to the penny.

On or before January 3, 1977, the other officers of SNB were informed of the "serious problem" in the MOB account. By January 3, the problem had become "common knowledge" in the bank, and orders were issued to all personnel that no item was to be cleared through the account without approval by Domer. Despite this knowledge and the specific instructions, SNB subsequently accepted several checks returned by Overland Park State Bank that had been deposited to account number 0201839 the last three days of December. The majority of these checks were returned after Overland Park State Bank's "midnight deadline," and SNB stipulated at trial

that these checks would not have had to be accepted. The few remaining checks were in all probability late, but the evidence adduced at trial was not conclusive. The acceptance of all the Overland Park State Bank checks, totalling $167,129.99, increased SNB's loss substantially.

Plaintiff notified defendant of its loss by letter dated January 19, 1977. This letter did not purport to be a claim, but merely put the defendant "on notice" of the loss. The acceptance of the Overland Park State Bank checks, after discovery of the MOB scheme but before notification of the surety, prejudiced the defendant by SNB's voluntarily increasing the loss sustained.

In January 1977 MOB, Sexton Printing, Hyer Boot and Kansas City Central Paper Box filed petitions in bankruptcy in the United States District Court for the Western District of Missouri. SNB filed proofs of claim in each of these bankruptcies. The claims included the amount of MOB's defaulted loans, as well as the loss resulting from the check kiting scheme. On May 5, 1980, SNB settled its claim with the trustee in bankruptcy, and in return for payment of $680,375.00, SNB dismissed its claims with prejudice, and released the debtors with no reservation of rights against the bankrupt companies. The estates of the bankrupts contained $827,181.00 after the settlement. No evidence was presented at trial concerning the amount of other claims against the estates, or the present status of the bankruptcy estates. The amount received in settlement of the cases was applied by SNB entirely to the outstanding MOB notes to the bank.

Plaintiff and defendant entered into an insuring agreement March 13, 1976. This Bankers Blanket Bond, Standard Form No. 24 (Revised April 1969), specifically excluded from coverage any:

2(e) Loss resulting from payments made or withdrawals from any depositor's account by reason of *uncollected items of deposit having been credited* by the Insured to such account, unless such payments are made to, or withdrawn by,

such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or unless such loss is covered under Insuring Agreement (A) [concerning employee dishonesty or fraud, not alleged here].

In addition, the Bond contained a rider dated March 15, 1977, which added as an exclusion to the Bond's coverage:

... the Underwriter shall not be liable under any insuring Agreement for:

(IV) Loss resulting from payments made or withdrawals from a depositor's account involving funds *erroneously credited* to such account, unless such payments are made to or withdrawn by such depositor or representative of such depositor who is within the office of the Insured at the time of such payment or withdrawal, or unless such loss is covered under Insuring Agreement (A) [covering employee dishonesty or fraud, not alleged here].

The bond further provided that "at the earliest practicable moment after discovery of any loss" the insured was to give the insurer written notice.

The bond also required SNB to file a proof of loss "with full particulars" within six months (here extended an additional six months) after discovery. SNB submitted its formal proof of loss December 8, 1977, which stated only that the loss occurred under the following circumstances:

The loss is the direct result of a check kiting operation being conducted by Messrs. Mitchell and Oetting via the checking accounts of MOB, Sexton Printing Company, Hyer Boot Company, Tower Studios Company, Midwest Litho, Kansas City Central Paper Box and possibly other corporations.

Plaintiff's Exhibit 2.

Plaintiff submitted a letter dated May 16, 1978, as an amended proof of loss. The proof of loss filed within the 12-month limit did not contain "full particulars."

The loss suffered by SNB resulted from payments made by SNB to third parties from MOB's account number 0201839 after

uncollected items of deposit were credited to the account. If Mitchell and Oetting had not been allowed to draw on uncollected funds, no loss would have occurred.

### Conclusions of Law

#### 1. *The Bond Exclusion.*

All losses suffered by plaintiff resulted from SNB crediting uncollected items of deposit to MOB's account. The bank's loss is therefore excluded from bond coverage under exclusion 2(e) unless "such payments are made to, or withdrawn by, such depositor or his representative ... who is within the office of the insured at the time of such payment or withdrawal ..." There is no ambiguity in the words quoted. The plain meaning and common sense interpretation of this provision refer to payments or withdrawals in cash or by a negotiable instrument such as a cashier's check to the depositor or his representative over the counter within the bank. The exception clearly does not refer to bookkeeping functions or computer data processing procedures that would normally occur after banking hours when no depositor would be present.

It is also clear from the evidence that the bookkeepers, in coding the number "27" on the checks, did not in any way rely on the MOB messenger's presence in the bank after making a deposit. The mere writing of the number "27" on the checks did not constitute any form of "payment" as that term is used in the bond. This was merely an instruction to the transit department and could have been changed at any point in time before the bank's "midnight deadline," the time by which a bank must make the decision to pay an item or return it to the presenter unpaid. In addition, the loss occurred from checks that were paid by SNB to third parties, not to MOB or its subsidiaries who were the depositors in account number 0201839. The checks drawn on and made payable to that account by MOB and subsidiaries were merely "wash" transactions as far as the bank was concerned. The exception language in the bond is clear that the payment must be "to

or withdrawn by" *the depositor* or his representative.

■ Because we find the language is unambiguous, we need not construe the provision strictly against the insurer. Nor must we determine whether the fact that the bond was developed with the participation of the American Bankers Association removes it from consideration as an adhesion contract. Since the exception to the exclusion does not apply, the loss suffered by the bank is excluded from coverage because it was a loss resulting from payments made by SNB to third parties from MOB's account by reason of uncollected items of deposit having been credited by SNB to the account.

#### 2. *Release of the Debtors in the Bankruptcy Proceeding.*

■ As a general rule, discharge of a principal debtor by a creditor discharges the surety, unless the surety has consented to remain liable or the creditor reserves rights against the surety. *Restatement of the Law of Security,* § 122 (1941). Plaintiff, while not questioning the general rule, contends that if there is no prejudice shown to have occurred to impair the surety's rights by the release, then the release does not discharge the surety. · It was stipulated at trial that the release by the plaintiff to the trustee in bankruptcy for the debtor companies was with prejudice and without any reservation of rights. As early as 1892, the Supreme Court of Kansas recognized the general rule in the following language:

> ... [W]henever the creditor relaxes his hold on the principal debtor, he impairs the hold upon him which the surety would acquire by substitution in his place on making payment; and good faith and fair dealing require that the surety should not be exposed to the injuries which might thus be inflicted upon him. In the immense majority of cases the act done does not actually damage the surety a shilling, yet the doctrine is so firmly established that only legislative enactment can change it.

*Stove Works v. Caswell,* 48 Kan. 689, 699, 29 P. 1072 (1892), *quoting* 2 Daniel, *Negotiable Instruments* (4th ed.) § 1312.

Initially, plaintiff relies on the early case of *Ray v. Brenner,* 12 Kan. 105 (1873), but we are not persuaded the decision sustains plaintiff's position. In *Ray,* a creditor recovered a judgment against a principal and the principal's surety. After the death of the principal, the creditor did nothing to execute on his judgment against the principal's solvent estate. The estate proceeded to final settlement and four years after final settlement, the creditor sought to recover on his judgment against the surety, the earlier judgment having become dormant. The Kansas Supreme Court held that the mere failure of the creditor to proceed against the principal's estate did not bar recovery from the surety. "All that can be said is, that the creditor omitted to proceed. No act of his extinguished the obligation of the principal debtor." *Id.* at 108. In the instant case Security National Bank did, by its own action, release the bankrupt debtors. This was much more than a mere failure to proceed.

Plaintiff further relies on *Aetna Casualty & Surety Co. v. Phoenix Nat'l Bank & Trust Co.,* 285 U.S. 209, 52 S.Ct. 329, 76 L.Ed. 709 (1932). In that case, a bank had entered into an indemnity agreement with an insurance company, which indemnified the bank for any loss suffered through the payment of forged checks. The bank discovered that it had paid numerous forged checks because of a fraudulent scheme perpetrated by a depositor's bookkeeper over a period of one year. The bank credited the depositor's account, but made no effort to proceed against either the depositor or any of the endorsers of the check. The Supreme Court held that the bank could not relinquish any claim it might have had against the depositor and "preserve unimpaired its right to the indemnity." *Id.* at 214, 52 S.Ct. at 331.

> Petitioner's undertaking "to indemnify ... and hold harmless" the respondent from any loss sustained by reason of the specified payments, contained no words indicating an intention to destroy the indemnitor's usual privilege of subrogation to the indemnitee's right to recover from any who are liable to it for the loss. That privilege was a necessary incident to petitioner's contract, for only by resort to it could the character of the contract as indemnity be preserved. It is both the object and the justification of the subrogation that it makes exact indemnity the measure of the liability....
>
> ... [R]espondent was still under a duty not to impair the rights which petitioner, upon payment of its obligation, might enforce against third persons. *The failure to observe that duty,* by stating an account *which relinquished all claims against its depositor,* ... *released the petitioner from the liability which had already accrued....* To hold that respondent could, without affecting its indemnity, relieve its rights against those who might be liable for its loss would be to hold, by a parity of reasoning, that respondent could enforce them with a similar lack of effect upon its right to recover from petitioner. In either case petitioner's contract would be converted from one of indemnity, as stipulated, into an unqualified obligation to repay to the bank the amounts which it was induced to pay by the forgeries.

*Id.* at 214–15, 52 S.Ct. at 331 (emphasis supplied).

The Court in *Aetna,* therefore, relied upon the general rule that release of the principal without consent or a reservation of rights releases the surety. The plaintiff in the instant case seizes upon one statement by the Court to support its argument:

> It is unnecessary to decide with finality what might have been the rights of the bank against other parties. It is enough to say that neither the decisions in the federal courts nor the statutes and decisions of Kentucky, which are controlling, preclude a successful defense to assertion of a claim by the depositor. If the indemnitee assumes to relinquish its rights without the consent of its indemnitor, the burden rests on it to establish

**148**

that they are nonexistent or unsubstantial.

*Id.* at 215, 52 S.Ct. at 331.

We are not persuaded that this dicta operates to amend the general and long established rule relied upon by the Court. However, even assuming arguendo that a lack of prejudice to the surety precludes its release, we believe that plaintiff has not met its burden. Plaintiff adduced no evidence at trial that would support its claim that the surety suffered no prejudice. Gilbert Gose, the trustee in bankruptcy for the companies, testified that after the settlement, $827,181 was left in the bankrupts' estate. No evidence was presented to explain what happened to those remaining assets. For that matter there was no proof that the estates had been finally discharged in bankruptcy.

In *Gunnell Construction Co. v. Hartford Accident & Indemnity Co.*, 374 F.2d 278 (D.C.Cir.1966), a creditor worked out a compromise with the trustee in bankruptcy and in the compromise, which was approved by the bankruptcy referee, the creditor reserved any rights it had against the debtor's bonding company. The bonding company lodged an objection to the compromise. The praecipe signed by the parties' attorneys, and filed in the district court, however, merely stated that the cause was "settled by compromise and dismissed with prejudice as to all claims, setoffs, and counterclaims." *Id.* at 279. In a later action the district court held that the creditor was barred from proceeding against the bonding company because of the dismissal with prejudice without a specific reservation of rights. The court of appeals upheld the district court's grant of summary judgment for the defendant bonding company. In a strongly worded dissent, Judge Tamm points out that the majority reaches this result even though the actual compromise agreement entered into between the parties *did* reserve rights against the bonding company and even though the bonding company was on notice and informed of the actions of the creditor and principal. The dissent acknowledges that "it is well settled that the obligee's release of the principal or his agreement to extend time to the principal discharges the surety ..., it is equally well settled that the surety is not released by a release or extension of time to the principal by the obligee if the obligee *reserves his rights* against the surety." *Id.* at 282 (emphasis in original). As we have noted above, the release by plaintiff of the debtors in this case reserved no rights.

■ We can only conclude that plaintiff's release of the debtors in the bankruptcy proceedings without any reservation of rights and without the defendant's consent effected a release of the defendant under the obligations of its bond. Even accepting plaintiff's argument based on the *Aetna* case, we reach the same conclusion, for the plaintiff has failed to carry its burden of showing lack of prejudice to the surety.

*3. Timely Notice.*

As previously noted, the bond in this case provided that written notice to the insurer was required "at the earliest practicable moment after discovery of any loss." Actual discovery was made by the bank January 2, 1977. Plaintiff argues that a purely subjective test as to the time of discovery should be utilized, and asserts that the notification to the surety by letter dated January 19, 1977, was at the earliest practicable moment after the discovery by Domer on January 2. Accepting plaintiff's contention for the moment, we find that plaintiff's notice at least seventeen days after the discovery of the loss was clearly not notice "at the earliest practicable moment" as to the checks returned by Overland Park State Bank, and debited against the account on January 7, constituting roughly $167,000 of the loss. This delay clearly resulted in prejudice to the surety, as SNB actually increased its loss by paying checks it was not legally obligated to pay.

The Kansas Supreme Court in *Local No. 1179 v. Merchants Mutual Bonding Co.*, 228 Kan. 226, 230, 613 P.2d 944 (1980), noted that "the failure of the obligee to

give notice of the principal's default in strict compliance with terms of the bond does not relieve the surety of liability *when the failure to notify resulted in no actual loss or prejudice to the surety.*" *Id.* at 230, 613 P.2d 944 (emphasis added). In discussing the notice requirement in *La-Harpe Farmers Union v. United States F & G Co.*, 134 Kan. 826, 830, 8 P.2d 354 (1932), the court stated:

> The purpose of the notice was to enable the surety company to make investigations and to take the necessary steps to indemnify or protect itself, and it was a plain provision which expressed the agreement of the parties with such clearness as can leave no controversy as to its meaning. It has been held that the failure of the insured to comply with such a requirement will defeat a recovery.

Even earlier, in *School District v. McCurley*, 92 Kan. 53, 58, 142 P. 1077 (1914), the Kansas court held:

> The breach of a condition precedent in a bond given by an insurer for pay will not relieve the insurer from liability for any loss for which he would otherwise be liable *unless such breach contributed to the loss.* (Emphasis added.)

Where the facts are undisputed, timeliness of notice is a question of law. *Alfalfa Electric Coop., Inc. v. Travelers Indemnity Co.*, 376 F.Supp. 901, 908 (W.D.Okla. 1973). *Alfalfa Electric Coop.* involved a claim under a fidelity bond for losses sustained because of the dishonesty of an employee. The court in discussing what constituted "discovery" stated:

> Paraphrased, "discovery" means that time when the insured gains sufficient factual knowledge, not mere suspicion, which would justify a careful and prudent man in charging another with dishonesty. An oversimplification of the definition is that when the insured learns the facts constituting the alleged dishonesty his prior suspicions, if any, are converted to knowledge which he cannot ignore and which constitutes "discovery." Thus, in *Hidden Splendor Mining Co. v. General Ins. Co. of America*, 370 F.2d

515 (10th Cir.1966), the court held that the insured knew or had reason to believe there had been employee dishonesty long before it was reported to the carrier because it was knowledgeable of the basic facts and that such knowledge properly could not be characterized as "suspicion." Knowledge is what a reasonable person should have concluded from known facts. *Hidden Splendor* cites *Pauly* [*American Surety Co. v. Pauly*, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977 (1898)], along with *American Employers' Ins. Co. v. Raton Wholesale Liquor Co.*, 123 F.2d 283 (10th Cir.1941), in which the Court states:

> "... the Raton Company was not required to report merely suspicious conduct, *but rather only knowledge which would justify a careful and prudent man in charging another with fraud or dishonesty ...*"

*Alfalfa Electric Coop., supra,* at 906.

In *Hidden Splendor Mining Co.,* cited by the *Alfalfa Electric Coop.* court, the Tenth Circuit found that the insured "either knew or had reason to believe" that a fraud had been committed before the date claimed by the insured as the date of discovery. This was true even though the testimony by one of the officers of the insured was that he "never thought about fraud or any other term at that point." *Id.* at 519. The court concluded "we think these facts entirely sufficient to alert a reasonably prudent person that a fraud had been committed."

In the instant action, the facts necessary to discover the loss were at all times in the control of the bank. The knowledge of the officers and employees of the bank must be imputed to SNB. The knowledge of the bank well exceeded mere suspicion. The tellers, bookkeepers, and other employees dealing with the MOB account from September through December had actual knowledge of the deposits and the continual drawing on uncollected funds. Statements were sent to MOB by the bank on the average of every three or four days. The bank officers had knowledge of MOB's

questionable financial status and banking practices with SNB in the past. Those officers directly involved with MOB's activities as a customer had available to them the bank's internal daily reports and the voiced concerns of the bookkeeping department; yet, they shut their eyes to what would have been the obvious. It is clear that the bank had "knowledge" of the loss long before January 1977: knowledge which would have justified a careful and prudent person in charging MOB with a check kiting scheme, at least by October of 1976, if not earlier. Plaintiff alleges that no prejudice has been shown to the defendant by reason of its failure to receive notice before January 1977. This argument is absurd, as one can hardly imagine a clearer example of a loss increasing on a daily basis because of the bank's failure to act on its own knowledge and to notify the bonding company in order to allow the company to protect its interests.

We have not overlooked the cases cited by the plaintiff, *Federal Deposit Insurance Corp. v. Lott*, 460 F.2d 82, 86 (5th Cir.1972) (holding that the fact directors may have had knowledge of irregularities and violations is not by itself sufficient to trigger the bank's obligation to notify its bonding company); and *Midland Bank & Trust Co. v. Fidelity & Deposit Co. of Maryland*, 442 F.Supp. 960, 972 (D.N.J. 1977) (neither negligence nor inattention, nor any failure to discover what by diligence might have been discovered, nothing, in fact, short of actual discovery by the bank of dishonesty, or a positive breach of an imperative condition, will defeat claims for loss caused by that dishonesty). We do not find these cases persuasive.

In *Jennings v. Horace Mann Mutual Insurance Co.*, 549 F.2d 1364, 1367 (10th Cir.1977), the court discussed the three different approaches courts have taken with respect to prejudice resulting from the failure to notify the insurer of an accident or loss in a timely fashion. The first is that prejudice is immaterial, and that failure to give timely notice results automatically in loss of coverage; the second view is that an unreasonably late notice raises a presumption of prejudice to the insurer and the insured has the burden of showing lack of prejudice; and the third view presumes no prejudice results and places the burden on the insurer to demonstrate substantial prejudice before it may be relieved of liability. From our study of the Kansas cases, we believe that Kansas accepts the third approach, and that defendant here has met its burden showing prejudice from the untimely notice. *See also Montgomery v. Professional Mutual Insurance Co.*, 611 F.2d 818 (10th Cir.1980).

■ This is not a case where the facts were obscured by an employee in collusion with Mitchell and Oetting. Nor is it a case where an extensive investigation was needed in order to ascertain what was happening. The scheme and the loss resulting from the scheme was readily apparent to anyone who would but take the time to look at the bank's own records. In the exercise of ordinary care or diligence by bank officers the scheme would have been discovered by October 1976, if not prevented. The prejudice to the insurer in this case was so great that the failure to give timely notice must result in a denial of coverage.

4. *The Overdraft as a Loan.*

Since we have already found that the loss in this case is not covered by the defendant's bond, we need not discuss at length defendant's contention that the overdraft privileges accorded MOB constituted a "transaction in the nature of, or amounting to, a loan" and therefore were excluded under the bond provisions. [Section 2, para. (e)]. If the bond language contained only the word "loan," a check kiting scheme would not come within the loan exclusion:

In its "plain, ordinary and popular sense," and as it has consistently been interpreted in the context of the Bankers' Blanket Bond, the word "loan" does not include money advanced in good faith on worthless checks.

*National Bank of Commerce in New Orleans v. Fidelity & Casualty Co.,* 312 F.Supp. 71, 75 (E.D.La.1970).

In the instant case, however, the operative language of the exclusion goes further than merely excluding loans from the coverage of the bond and extends to any "transaction in the nature of or amounting to," a loan. *See Citizens Nat'l Bank v. Travelers Indemnity Co.,* 296 F.Supp. 300 (M.D.Fla.1967).

In *Calcasieu-Marine National Bank v. American Employers Insurance Co.,* 533 F.2d 290, 296–97 (5th Cir.1976), the court undertook to define the term "loan" used in the policy exclusion:

> The classic definition of a loan is given in *In re Grand Union Co.,* 2 Cir.1914, 219 F. 353, 356.
>
> > A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows.
> >
> > "In order to constitute a loan there must be a contract whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the transaction will be considered a loan without regard to its form." ...
>
> Repeatedly, it has been observed that a loan may exist regardless of the form of a transaction.

A strong argument can be made that SNB had what amounted to an implied agreement or understanding with Mitchell and Oetting that the bank's funds could be used for a day upon the condition that Mitchell and Oetting "would repay" those sums by making an additional deposit the next day. The bank charged the MOB account a service charge of $4.00 for each check rejected by the computer as NSF; the total of these charges from September through December was $1,250.00. The fact that this "credit advance" was prearranged and approved by Griffin and/or Beachley supports the proposition that this arrangement was a transaction "in the nature of, or amounting to, a loan" under the terms of the policy. Certainly in this situation there is no evidence of a promissory note, but a note is not a prerequisite for the transaction to constitute a loan. Defendant argues that SNB "must have known that there was considerable risk in crediting the deposits before collection." We note also that there is some authority for the proposition that an overdraft on a demand deposit account constitutes a "loan." *Schramm v. Bank of California Nat'l Ass'n,* 143 Or. 546, 20 P.2d 1093, 1096 (1933); *cf. Bromberg v. Bank of American Nat'l Trust & Savings Ass'n,* 58 Cal. App.2d 1, 135 P.2d 689, 692 (1943); *Prowinsky v. Second National Bank,* 265 F. 1003 (D.C.Cir.1920); *Florida-Patsand Corp. v. Central Bank & Trust Co.,* 177 So.2d 533, 534 (Fla.App.1965). We are generally impressed with defendant's argument, but we need not rest our decision on this ground in view of our earlier conclusions.

*Conclusion.*

Defendant's rejection of plaintiff's claim was legally justified. The loss suffered by SNB is excluded by the plain language of the check kiting exclusion and is not saved by the exception to the exclusion as a payment to the depositor on the bank premises. Furthermore, the unconditional discharge by SNB of the debtors in the bankruptcy proceedings operated as a release of its surety. Finally, the bank failed to give notice to its bonding company at the "earliest practicable moment," and such failure resulted in prejudice to the defendant. The failure to give timely notice therefore relieved the defendant from its obligation under the bond. Defendant is entitled to judgment.

Counsel for defendant will prepare, circulate and submit to the court a journal entry of judgment consistent with this opinion.